**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| WASIF IBRAHIM, individually and on behalf of classes of similarly situated individuals, | ) ) ) | Case No. No. 1:16-cv-04294 |
| Plaintiff, | ) ) | Judge Marvin E. Aspen |
| v. | ) ) | |
| AMERICAN HONDA MOTOR CO., INC., a California corporation, | ) ) ) | |
| Defendant. | ) ) | |

**ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM**
**FOR DECLARATORY JUDGMENT**

Defendant American Honda Motor Co., Inc. ("American Honda"), for its answer, affirmative defenses, and counterclaim for declaratory judgment, states as follows:

**PRELIMINARY STATEMENT**

The Takata airbag inflator safety recall is the largest automobile safety recall in U.S. history. The risk posed by Takata airbag inflators to driver and passenger safety is real and particularly acute in older vehicles in areas with high humidity. As a result, American Honda has engaged in unprecedented efforts to reach its customers and urge them to take their vehicles to independent, authorized Honda and Acura dealers to have the affected Takata airbag inflators in their cars replaced free of charge.

Given the urgency and size of the Takata safety recall, traditional recall notice mailers, by themselves, are insufficient to reach and motivate all affected customers to bring their car to a dealer to have the Takata airbag inflators in their vehicles replaced. One of the methods implemented by American Honda involves the use of automated and predictive dialers to initiate

voice mail messages and live operator calls to telephone numbers, both landline and mobile, associated with the relevant vehicles. This method of communication, which is condoned and urged by both the National Highway Traffic Safety Administration ("NHTSA") and the independent Takata monitor appointed by NHTSA to oversee the recall, coupled with other innovative means of communication, has enabled American Honda to achieve the highest Takata inflator replacement rate in the automotive industry. But there are millions of Honda and Acura customers driving vehicles who have not yet had their Takata inflators replaced, and those customers must be contacted and urged to have their vehicles repaired. Simply put, American Honda's telephone outreach program is necessary for the health and safety of its customers.

Notwithstanding the risk posed to drivers and passengers, and the obvious benefit the public derives from American Honda's telephone outreach campaign, Plaintiff Ibrahim has filed this meritless class action against American Honda, erroneously claiming American Honda's telephone outreach campaign violates the Telephone Consumer Protection Act ("TCPA"). Plaintiff claims the calls made to his cell phone, which was believed to be associated with two Honda vehicles previously owned by Plaintiff's family members, unreasonably disturbed his privacy. By way of his Complaint, Plaintiff Ibrahim seeks to enjoin American Honda from trying to communicate with customers who are driving vehicles with Takata inflators that, if not replaced, could cause severe injury or death.

Plaintiff Ibrahim's decision – and his lawyers' decision – to bring this litigation is disturbing given the realities of the Takata inflator recall and seeks to create undue impediments to American Honda's outreach efforts. American Honda's telephone outreach program is necessary for the health and safety of the public and squarely falls within the TCPA's exception for exactly this sort of situation. And, contrary to Plaintiff Ibrahim's allegations, when American

Honda learned that Plaintiff did not own a Honda or Acura vehicle, calls to his mobile number ceased.

In light of the urgency and necessity of its telephone outreach campaign, American Honda seeks a declaration from this Court that American Honda's telephone outreach campaign does not violate the TCPA.

## ANSWER

### NATURE OF THE ACTION

1.      In an effort to advance a recall of defective airbags in its vehicles, Honda, a multinational manufacturer and distributor of automobiles and other vehicles, violated federal law when it made unauthorized telephone calls using a prerecorded or artificial voice ("robocalls") to the cellular telephones of individuals throughout the nation.

**ANSWER:** In an effort to inform Honda and Acura customers about the recall of defective Takata airbag inflators in Honda and Acura vehicles, American Honda instituted a comprehensive customer outreach program that includes calls to telephone numbers associated with recalled Honda and Acura vehicles. These calls were and are necessary for public health and safety; as a result, these calls fall within the "emergency" exception in the TCPA and do not violate the TCPA. American Honda denies all remaining allegations in Paragraph 1.

2.      By effectuating these unauthorized robocalls, Defendant has violated the called parties' statutory rights and has caused the call recipients actual harm, not only because the called parties were subjected to the aggravation and invasion of privacy that necessarily accompanies unsolicited automated calls – particularly calls using a prerecorded or artificial voice – but also because the called parties, like Plaintiff, must frequently pay for the calls they receive or incur a usage allocation deduction from their calling plans, even though the calls were made in violation of specific legislation.

**ANSWER:** American Honda denies the allegations in Paragraph 2.

3.      To redress these injuries, Plaintiff, on behalf of himself and two nationwide classes, brings suit under the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* (the "TCPA"), which protects the privacy right of consumers to be free from receiving unsolicited telephone calls using a prerecorded or artificial voice.

**ANSWER:** American Honda admits that Plaintiff purports to seek certification of two nationwide classes under the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA"). American Honda denies the remaining allegations in Paragraph 3.

4.     On behalf of the proposed classes, Plaintiff seeks an injunction requiring Defendant to cease all unauthorized telephone calls using a prerecorded or artificial voice and an award of statutory damages to the members of the classes, together with costs and reasonable attorneys' fees.

**ANSWER:** American Honda admits that Plaintiff purports to seek an injunction requiring American Honda to cease all "unauthorized calls" using a prerecorded or artificial voice and an award of statutory damages to the members of the classes, together with costs and reasonable attorneys' fees, on behalf of himself and the proposed class he seeks to represent. American Honda denies that Plaintiff is entitled to any of the relief he seeks.

## JURISDICTION AND VENUE

5.     This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331, as the action arises under the federal Telephone Consumer Protection Act, 47 U.S.C. § 227.

**ANSWER:** Admitted.

6.     Venue is proper in this District pursuant to 28 U.S.C. 1391(b), because Defendant resides in this District, as Defendant conducts business and maintains offices in this District; and because a substantial part of the events concerning the conduct at issue occurred in this District, as the unauthorized calls at issue were received in this District.

**ANSWER:** Denied.

## PARTIES

7.     Plaintiff is a resident of Illinois.

**ANSWER:** American Honda lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7.

8.     Defendant is a California corporation with its principal place of business located in California.  Defendant is registered to transact business in Illinois and conducts business in this District.

4

**ANSWER:** Admitted.

## COMMON ALLEGATIONS OF FACT

9.     Defendant is a multinational manufacturer and distributor of automobiles and other vehicles marketed and sold to consumer across the country, including in Chicago.

**ANSWER:** American Honda denies it is a multinational manufacturer of automobiles. American Honda admits the remaining allegations in Paragraph 9.

10.     Following an investigation of defective airbags by the National Transportation Safety Board and others, which found that certain types of airbags in Defendant's automobiles were not deploying correctly, Defendant commenced a recall of these airbags from vehicles that it sold in the United States.

**ANSWER:** American Honda denies the allegations in Paragraph 10. American Honda initially recalled certain vehicles with Takata airbag inflators in 2008. American Honda has initiated additional recalls of Honda and Acura vehicles containing Takata inflators since that time. In 2014, following an investigation by the National Highway Traffic Safety Administration, not the "National Transportation Safety Board," American Honda, as well as approximately 10 other automotive companies and Takata itself, have recalled tens of millions of vehicles containing affected Takata inflators.

11.     To expedite its airbag recall, Defendant engaged in an automated calling operation to alert owners of Defendant's affected vehicles.

**ANSWER:** Admitted.

12.     In an effort to reduce costs associated with maintaining its automated calling operation, Defendant failed to implement adequate procedures to confirm that the telephone numbers to which Defendant placed robocalls actually belong to the persons who supposedly provided them to Defendant and/or its agent dealers.

**ANSWER:** Denied.

13.     As a consequence, many of the telephone numbers Defendant utilizes in connection with its notification operation are inaccurate, or have become inaccurate, resulting in Defendant routinely placing telephone calls using a prerecorded or artificial voice to the cellular telephones of individuals who never provided consent to be called by Defendant, including persons who, like Plaintiff, have never even owned a Honda vehicle.

**ANSWER:** Denied.

14. In addition to being an aggravating invasion of privacy, unsolicited automated telephone calls can actually cost their recipients money, because cell phone users like Plaintiff have to pay their respective wireless service providers for each text message call they receive, incur a usage allocation deduction from the total number of text messages allowed under their cell phone plan, or pay a fixed or variable usage fee.

**ANSWER:** American Honda lacks knowledge or information sufficient to

form a belief as to whether "telephone calls can actually cost their recipients money, because cell

phone users like Plaintiff have to pay their respective wireless service providers for each text

message call they receive, incur usage allocation deduction from the total number of text

messages allowed under their cell phone plan, or pay a fixed or variable usage fee." Also,

American Honda is unsure why Plaintiff includes allegations about the costs of text messages

when Plaintiff does not allege that American Honda sent him any text messages.

15. Beginning in January 2016, Defendant has repeatedly invaded plaintiff's privacy, placing nearly a dozen calls to his cellular telephone, several of which featured a prerecorded or artificial voice.

**ANSWER:** American Honda denies it has "repeatedly invaded Plaintiff's

privacy." American Honda admits the remaining allegations contained in Paragraph 15.

16. For instance, in or about March 2016, Plaintiff received an automated call delivering the following message via an artificial or prerecorded voice:

> This is the Honda customer service team contacting you about an urgent safety recall notice regarding your 2002 Honda Accord vehicle. Honda has decided that a defect which relates to motor vehicle safety exists in certain vehicles. In some vehicles, the driver's front airbag inflator could produce excessive internal pressure upon deployment. If an affected airbag deploys, the increased internal pressure may cause the inflater to rupture. In the event of an inflater rupture, metal fragments could pass through the airbag cushion material and possibly hit you or others in the vehicle. Past ruptures like this have killed or injured vehicle drivers. Due to the severity of this defect please call us immediately. Do not delay in contacting us. Your Honda dealer will replace the driver's front airbag inflator at no cost to you. This free repair should take 45 minutes to complete but your Honda dealer may require your vehicle for a longer period of time based upon their work schedule. Honda believes that sufficient parts are available for the repair. However, in the event that parts are not available, if you desire Honda will

provide a loner vehicle at no cost until the repair can be completed. To schedule a recall service repair, contact us toll-free at 1-844-758-9245 between 8am and 7pm Monday through Friday EST or visit www.myhondaauto.com to locate a dealer to schedule the repair or if you no longer own the vehicle you can opt-out of future notification messages. Please have your vehicle identification number available or contact your local Honda dealer to schedule or order your replacement part or schedule a service appointment. We at Honda thank you for your prompt attention to this urgent safety recall notice.

**ANSWER:** American Honda admits that the text of the message reflected in the Complaint is substantially accurate.

17.    Plaintiff is not now, nor ever has been, an owner of any of Defendant's vehicles, including a 2002 Honda Accord.

**ANSWER:** American Honda lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17.

18.    Exasperated, Plaintiff repeatedly informed Defendant's customer service department that the phone number that Defendant had been calling did not belong to a Honda owner and that Defendant did not have permission to call that number. However, Plaintiff's complaints were repeatedly ignored by Defendant, and Defendant's unauthorized robocalls continued unabated.

**ANSWER:** Denied.

19.    At no time did Plaintiff provide Defendant with consent to receive any telephone calls, including any prerecorded or artificial voice calls from Defendant.

**ANSWER:** American Honda lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 19.

## CLASS ACTION ALLEGATIONS

20.    Plaintiff brings this action on behalf of himself and two classes (the "Classes") defined as follows:

(i)    Called Party Class: All persons in the United States and its territories who, within four years prior to the commencement of this litigation, received one or more telephone calls from Defendant on their cellular telephone featuring a prerecorded or artificial voice where the called party was not, according to Defendant's records, an owner of any of Defendant's vehicles; and

(ii)     Revocation Class: All persons in the United States and its territories who, within four years prior to the commencement of this litigation, received one or more telephone calls from Defendant on their cellular telephone featuring a prerecorded or artificial voice after communicating to Defendant that Defendant did not have consent to make any such calls to that telephone number.

**ANSWER:**  American Honda admits that Plaintiff purports to bring this action

on behalf of himself and two putative classes but denies that a class action is appropriate.

21.     Plaintiff will fairly and adequately represent and protect the interests of the other members of the Classes. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other members of the Classes, and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to those of the other members of the Classes.

**ANSWER:**  Denied.

22.     Absent a class action, most members of the Classes would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

**ANSWER:**  Denied.

23.     Defendant has acted and failed to act on grounds generally applicable to the Plaintiff and the other members of the Classes, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Classes, and making injunctive or corresponding declaratory relief appropriate for the Classes as a whole.

**ANSWER:**  Denied.

24.     The factual and legal bases of Defendant's liability to Plaintiff and to the other members of the Classes are the same, resulting in injury to the Plaintiff and to all of the other members of the Classes. Plaintiff and the other members of the Classes have all suffered harm and damages as a result of Defendant's unlawful and wrongful conduct.

**ANSWER:**  Denied.

25.     Upon information and belief, there are hundreds, if not thousands, of members of the Classes such that joiner of all members is impracticable.

**ANSWER:**  Denied.

26.     There are many questions of law and fact common to the claims of Plaintiff and the other members of the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not limited to, the following:

(a)     Did Defendant systematically place calls using a prerecorded or artificial voice to persons who did not previously provide Defendant with consent to call their respective cellular telephone numbers?

(b)     Did Defendant systematically continue to place calls using a prerecorded or artificial voice to persons who had previously communicated to Defendant that they did not consent to receive such calls from Defendant?

(c)     Did the unauthorized calls made by Defendant featuring a prerecorded or artificial voice violate the TCPA?

(d)     Was Defendant's conduct in violation of the TCPA willful such that the members of the Revocation Class are entitled to treble damages?

(e)     Should Defendant be enjoined from continuing to engage in such conduct?

**ANSWER:**  Denied.

## COUNT I
### Violation of Telephone Consumer Protection Act (47 U.S.C. § 227)
### on behalf of Plaintiff and the Classes

27.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

**ANSWER:**  American Honda incorporates by reference its responses to all

previous paragraphs.

28.     Defendant made unsolicited and unauthorized telephone calls using a prerecorded or artificial voice to the cellular telephone numbers of Plaintiff and the other members of the Classes.

**ANSWER:**  Denied.

29.     Defendant has, therefore, violated the TCPA, 47 U.S.C. §227(b)(1)(A)(iii).

**ANSWER:**  Denied.

30.     As a result of Defendant's illegal conduct, the members of the Classes have had their privacy rights violated, have suffered actual and statutory damages and, under 47 U.S.C. §227(b)(3)(B), are each entitled to, *inter alia*, a minimum of $500.00 in damages for each such violation of the TCPA.

**ANSWER:** Denied.

31.     To the extent the Court determines that Defendant's conduct was willful and knowing, the Court should, pursuant to §227(b)(3)(C), treble the amount of statutory damages recoverable by Plaintiff and the other members of the Classes.

**ANSWER:** American Honda denies that Plaintiff and the putative class are entitled to any damages, including treble damages.

WHEREFORE, Plaintiff, on behalf of himself and the Classes, prays for the following relief:

A.      An order certifying the Classes as defined above;

B.      An award of statutory damages;

C.      An injunction requiring Defendant to cease all unauthorized automated telephone activities;

D.      An award of reasonable attorneys' fees and costs; and

E.      Such further and other relief as the Court deems just and equitable.

**ANSWER:** American Honda denies Plaintiff and the purported class are entitled to any relief against American Honda. American Honda requests that the Court dismiss the Complaint and enter judgment in favor of American Honda on all claims against it, and order such further relief as the Court deems proper, including, to the extent appropriate, allowable costs and fees.

## AFFIRMATIVE AND SEPARATE DEFENSES

American Honda asserts the separate and affirmative defenses set forth below. By designating these defenses as separate and affirmative defenses, American Honda does not concede that it bears the burden of proof with respect to any of them.

## FIRST DEFENSE
### (Consent)

American Honda cannot be liable under the TCPA where Plaintiff, or any member of the putative class, expressly consented to receive calls on their cellular telephones.

## SECOND DEFENSE
### (Free Speech)

Holding American Honda liable for calling recipients who wished to receive the calls, or did not object to receiving the calls, would violate the First Amendment of the United States Constitution and similar provisions of various state constitutions.

## THIRD DEFENSE
### (Waiver)

Plaintiff's and/or putative class members' claims are barred in part or in whole by the doctrine of waiver.

## FOURTH DEFENSE
### (Due Process)

Awarding statutory damages to a class under the TCPA would violate the Fifth Amendment and Eighth Amendment of the United States Constitution and similar provisions of various state constitutions.

## FIFTH DEFENSE
### (Unconstitutionally Vague and Overbroad)

The TCPA is unconstitutionally vague and overbroad with respect to the definition of "automatic telephone dialing system."

## SIXTH DEFENSE
### (Emergency Exception)

The calls initiated by American Honda, or on its behalf, relating to the Takata inflator recall outreach campaign fall within the "emergency" exception in the TCPA.  47 U.S.C. § 227(b)(1)(A); 47 C.F.R. § 64.1200(F)(4).

## COUNTERCLAIM

Counterclaim Plaintiff American Honda Motor Co., Inc. ("American Honda"), for its Counterclaim for expedited Declaratory Judgment and other relief against Plaintiff and Counterclaim Defendant, Wasif Ibrahim, states as follows:

### NATURE OF THIS ACTION

1.      American Honda seeks a declaration that all calls made to mobile phones as part of American Honda's program to alert its customers that their vehicles are part of the Takata airbag safety recall ("Takata Airbag Recall Outreach Program"), including the calls made to Plaintiff, do not violate the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA").

2.      The National Highway Traffic Safety Administration ("NHTSA") and the monitor it appointed to supervise the Takata airbag inflator recall have expressly acknowledged that telephone calls to American Honda's customers are necessary to customer health and safety. Telephone calls made by American Honda under its Takata Airbag Recall Outreach Program fall squarely within the TCPA's "emergency purposes" exception, and are not a violation of the TCPA.

### PARTIES

3.      Upon information and belief, Counterclaim Defendant Wasif Ibrahim is a resident of Illinois.

4.      Counterclaim Plaintiff American Honda is a California corporation with its principal place of business in California.

## JURISDICTION

5.      The Court has federal question jurisdiction under 28 U.S.C. § 1331, as the action

arises under the federal Telephone Consumer Protection Act, 47 U.S.C. § 227.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because,

according to Counterclaim Defendant Ibrahim, a substantial part of the events giving rise to the

claims in this litigation occurred in this district.

## THE PRESENT DISPUTE

**THE TAKATA AIRBAG INFLATOR RECALL**

7.      On May 18, 2015, TK Holdings ("Takata) filed four Defect Information Reports

with NHTSA, which explained "that a defect related to motor vehicle safety may arise in some

of" its airbag inflators. Specifically, "this potential condition could create excessive internal

pressure when the air bag is deployed, which could result in the body of the inflator rupturing

upon deployment. . . . In the event of an inflator rupture, metal fragments could pass through the

air bag cushion material, which may result in injury or death to vehicle occupants." *See* TK

Holdings, Inc., Defect Information Reports 15E-040, 15E-041, 15E-042, and 15E-043 (May 18,

2015), attached as Exhibit A; *see also* Consent Order between NHTSA and TK Holdings Inc.

(May 18, 2015), attached as Exhibit B.

8.      The risks of Takata airbag inflators which have yet to be repaired have been

widely reported in the national and local press.  *See, e.g.*, Joan Lowy (Associated Press), "Takata

air bag death toll climbs to 10," Chicago Tribune (Jan. 22, 2016), *available at*

http://www.chicagotribune.com/classified/automotive/ct-takata-air-bag-death-toll-climbs-to-10-
20160122-story.html; Hiroko Tabuchi and Danielle Ivory, "Takata's Faulty Airbags Still Exact

Toll as Recalls Lag," New York Times (Jan. 30, 2016), *available at*

http://www.nytimes.com/2016/01/31/business/takatas-faulty-airbags-still-exact-toll-as-recalls-lag.html?_r=0.

**NHTSA'S INVOLVEMENT IN THE TAKATA AIRBAG INFLATOR RECALL**

9.      On November 3, 2015, NHTSA issued a Coordinated Remedy Order addressing the Takata airbag inflator recalls. In so doing, NHTSA acted pursuant to its legal authority to allow the agency to accelerate safety defect repairs. The Coordinated Remedy Order allows NHTSA to oversee the supply of remedy parts and manage future recalls with the assistance of an independent third-party monitor (the "Takata Monitor").  See Coordinated Remedy Order attached as Exhibit C.

10.      NHTSA has since appointed John Buretta as the Takata Monitor of the Takata Airbag Recall. In a letter from Mr. Buretta to American Honda dated April 1, 2016 ("Buretta Letter," Ex. D hereto), Mr. Buretta recommended the use of mobile phone calls as a strategy to reach consumers who may have vehicles in need of a recall and repair.

11.      The Buretta Letter contained an "Initial List of [Original Equipment Manufacturer] Enhanced Outreach Strategies."  Within the Enhanced Outreach Strategies, Mr. Buretta suggested the following for an Original Equipment Manufacturer ("OEM"), such as Honda Motor Co., Ltd., the parent company of American Honda:

> Consumer Outreach and Communication
>
> a.      *Phone calls and SMS messaging*.
>
> Establish a consistent protocol whereby dealers collect a broad array of customer contact information—**including mobile numbers**, landlines and email addresses—to supplement registration data. Make telephone calls to contact

> vehicle owners directly, and assist in scheduling repair appointments with a dealer during the call. Where mobile numbers are available, utilize SMS messaging.

Ex. D (Buretta Letter) (emphasis added).

12.     After this lawsuit was filed, American Honda sought clarification regarding the Buretta Letter from Elizabeth Mykytiuk, a Senior Trial Attorney with NHTSA ("Mykytiuk Email," Ex. E hereto). In her response, Ms. Mykytiuk wrote that the Buretta Letter "contain[ed] a list of general strategies to increase recall completion for the Takata air bag inflator recalls. Those strategies **include the use of phone calls and SMS messaging.** These recommended strategies were discussed at length between NHTSA and the Takata Monitor, and the **letter was sent with NHTSA's full support and approval.**" (Mykytiuk Email, Ex. E ) (emphasis added).

13.     More significantly, Ms. Mykytiuk's email to American Honda closes with the following relevant language:

> NHTSA firmly believes that such strong and extraordinary measures are necessary to ensure the health and safety of the American driving public. ***Therefore, NHTSA's view is that strategies for reaching consumers through the use of robo-calls and text messages, among other means, are in the public interest.***

(Mykytiuk Email, Ex. E ) (emphasis added).

**HONDA'S TAKATA AIRBAG INFLATOR RECALL EFFORTS**

14.     To date, American Honda has recalled millions of vehicles containing Takata airbags.

15.     Pursuant to NHTSA's mandate, and in an enhanced effort to alert its customers about the Takata airbag recall and encourage them to have their cars fixed, American Honda is engaging in an extensive outreach campaign which includes, among other things, mailings, phone calls, use of social media, and the use of third-parties and private investigators to aid in customer outreach about the safety recalls.

16.     American Honda aims to reach as many Honda and Acura customers as possible who may be affected by the Takata safety recall, and automated phone calls are an effective way to do so.

**CALLS TO PLAINTIFF WASIF IBRAHIM'S MOBILE PHONE NUMBER**

17.     On multiple occasions between September 2015 and March 29, 2016, American Honda, through a third-party, called a telephone number Mr. Ibrahim claims is his mobile telephone. American Honda called the number in an attempt to alert Mr. Ibrahim's sister that the 2002 Honda Accord, which American Honda believed was associated with Mr. Ibrahim's telephone number (and which vehicle his sister apparently owned within the last year), is subject to the Takata airbag safety recall and that the vehicle has not been repaired.

18.     During the March 29, 2016 call, a person answered the number Mr. Ibrahim asserts is his mobile telephone, and indicated he did not own a 2002 Honda Accord.

19.     No further calls were made by American Honda, or any of its agents, to Mr. Ibrahim's mobile telephone number after the March 29, 2016 call.

**COUNT 1:**
**DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. §§ 2201-2202**

20.     American Honda incorporates by reference the foregoing allegations as if fully set forth herein.

21.     An actual, present, and justiciable controversy exists between Counterclaim Plaintiff American Honda and Counterclaim Defendant Ibrahim concerning American Honda's continuation of its Takata Airbag Recall Outreach Program, which Counterclaim Defendant Ibrahim alleges in his Complaint violates the TCPA and which he seeks to enjoin.

22.     The Telephone Consumer Protection Act, 47 U.S.C. § 227, was enacted to address "[u]nrestricted telemarketing," which Congress found "can be an intrusive invasion of

privacy and, when an emergency or medical assistance telephone line is seized, a risk to public safety."

23.     The TCPA prohibits calls from an automatic telephone dialing system or an artificial or prerecorded device to a mobile telephone without the consent of the called party.

24.     The TCPA also specifically exempts calls made for "emergency purposes." 47 U.S.C. § 227(b)(1)(A).

25.     Congress charged the Federal Communications Commission ("FCC") with the task to "design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy." Public Law 102-243, Sec 2, Findings.

26.     In its first Notice of Proposed Rulemaking mandated by the TCPA, the FCC noted that "[t]he legislative history of the TCPA indicates a congressional intent to interpret the term 'emergency' broadly rather than narrowly." *In re Telephone Consumer Protection Act of 1991*, 7 F.C.C. Rcd. 2736, ¶ 17 (Apr. 17, 1992). The FCC "propose[d] to interpret 'emergency' to include situations in which it is in the public interest to convey information to consumers concerning health or safety, whether or not the event was anticipated or could have been anticipated."

27.     In the FCC regulations that followed, the FCC defined "emergency purposes" to mean "calls made necessary in any situation affecting the health and safety of consumers." 47 C.F.R. § 64.1200(a)(f)(4); *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 F.C.C. Rcd. 8752, 8791 (Oct. 16, 1992).

28.     The Takata Airbag Recall Outreach Program calls fall within the "emergency purposes" exception in the TCPA because the Takata airbag recall concerns the health or safety of consumers.

17

29.     The Complaint filed by Plaintiff acknowledges that, in the automated call allegedly received by Plaintiff, American Honda made clear that the call concerned an "**urgent safety recall notice**" relating to the "driver's front airbag inflator" which, if not remedied, "may cause the inflator to rupture."  Compl. ¶ 16 (emphasis added). The prerecorded message also allegedly stated, "[p]ast ruptures like this have **killed or injured vehicle drivers**. Due to the severity of this defect please call us immediately." *Id.* (emphasis added).

30.     The purpose of the call was to inform and encourage Honda and Acura owners to have the Takata airbag inflator in their vehicle replaced at no charge.

31.     Due to the severity of the issue, and the possible impact on customers' health and safety, NHTSA and the Takata monitor it appointed to oversee the Takata airbag inflator recall authorized and encouraged calls to customer mobile phones using automated and predictive dialing technology.  See ¶¶ 11-13.

32.     Because the Takata Airbag Recall Outreach Program calls fall within the "emergency purposes exception," the calls do not violate the TCPA.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaim Plaintiff American Honda respectfully requests that this Court enter an order:

A.      Declaring that the Takata Airbag Recall Outreach Program calls do not violate the TCPA;

B.      An award of reasonable attorneys' fees and costs; and

C.      For such other and further relief this Court deems just and equitable.

Dated:  May 10, 2016                    Respectfully submitted,


                                        By: /Michael L. Mallow_____
                                        One of the Attorneys for Defendant,
                                        AMERICAN HONDA MOTOR CO., INC.

                                         Eric S. Mattson
                                         emattson@sidley.com
                                         SIDLEY AUSTIN LLP
                                         One South Dearborn Street
                                         Chicago, Illinois 60603
                                         Telephone: (312) 853-7000
                                         Facsimile:  (312) 853-7036

                                         Michael L. Mallow
                                         mmallow@sidley.com
                                         Michael B. Shortnacy
                                         mshortnacy@sidley.com
                                         SIDLEY AUSTIN LLP
                                         555 West Fifth Street, Suite 4000
                                         Los Angeles, California  90013
                                         Telephone:  (213) 896-6000
                                         Facsimile:  (213) 896-6600

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 10, 2016, I caused copies of the foregoing Answer,

Affirmative Defenses, and Counterclaim for Declaratory Judgment to be served via the Court's

ECF system on all counsel of record.


/s/ Michael L. Mallow

# EXHIBIT A

May 18, 2015

DEFECT INFORMATION REPORT

TK HOLDINGS INC.

PSDI, PSDI-4, and PSDI-4K DRIVER AIR BAG INFLATORS

1. **Manufacturer's name:**

TK Holdings Inc. ("Takata").

2. **Items of equipment potentially affected:**

All PSDI, PSDI-4, and PSDI-4K air bag inflators installed in frontal driver air bag modules in vehicles in the United States. This Report contemplates a national recall of the subject inflators. The subject inflators include all years of production, from start of production to end of production.

In accordance with the proposed staging of the remedy program described in section 7 below, the scope of the recall contemplated by this Report includes vehicles containing the subject inflators that were previously recalled and remedied by the affected vehicle manufacturers, including under recall numbers 08V-593, 09V-259, 10V-041, 11V-260, 14V-351, 14V-343, 14V-344, 14V-348, 14V-817, 14V-802, and 15V-153.

The inflators covered by this determination have been installed as original equipment or remedy parts in vehicles sold or registered in the United States and manufactured by the following five vehicle manufacturers (listed alphabetically):

American Honda Motor Co.
1919 Torrance Blvd.
Torrance, CA 90501-2746
Phone: 310-783-2000

BMW of North America
P.O. Box 1227
Woodcliff Lake, NJ 07677-7731
Phone: 201-307-4000

Chrysler Group LLC
800 Chrysler Drive
Auburn Hills, MI 48326-2757
Phone: 1-800-853-1403

**TK HOLDINGS INC.**
**May 18, 2015**

Ford Motor Company
330 Town Center Drive
Dearborn, MI 48126-2738
Phone: 1-866-436-7332

Mazda North American Operations
46976 Magellan Drive
Wixom, MI 48393
Phone: 248-295-7859

**3.** **Total number of items of equipment potentially affected:**

Takata estimates that a combined total of approximately 17.6 million subject inflators have been installed in vehicles in the United States as both original equipment and remedy parts. Of that number, Takata estimates that approximately 4.7 million are PSDI inflators and approximately 12.9 million are PSDI-4 and PSDI-4K inflators. Included within these estimates are approximately 9.7 million inflators that were subject to previous recalls or safety campaigns.

**4.** **Approximate percentage of items of equipment estimated to actually contain the defect:**

The number of field incidents known to Takata involving ruptures of PSDI subject inflators in the United States is fifty-nine (59). Fifty-four (54) of those field incidents occurred in vehicles that were subject to previous recalls. The number of field incidents known to Takata involving ruptures of PSDI-4 and PSDI-4K subject inflators in the United States is four (4). For comparison purposes, Takata estimates that there have been approximately 258,500 total field deployments of PSDI subject inflators and approximately 516,000 total field deployments of PSDI-4 and PSDI-4K subject inflators in the United States. Those estimates are based on the numbers of subject inflators described in section 3, estimates of the average age of the subject inflators in the field (11 years for PSDI and 8 years for PSDI-4K), and an estimate (used by NHTSA in its data analyses) that an average of 0.5 percent of frontal air bags deploy in the field each year. In addition, as described below, since September 2014, Takata has conducted ballistic testing of a selected population of subject inflators returned by vehicle manufacturers, including a disproportionate number of subject inflators returned from areas of high absolute humidity; that ballistic testing to date has resulted in no (zero) ruptures of PSDI subject inflators tested and has resulted in nine (9) ruptures (approximately 0.0722 percent) of PSDI-4 and PSDI-4K subject inflators tested, all from high absolute humidity States.

**TK HOLDINGS INC.**
**May 18, 2015**

5. **Description of the defect:**

As a result of the developments and circumstances described below and in section 4 above, Takata has determined that a defect related to motor vehicle safety may arise in some of the subject inflators.

The batwing-shaped propellant wafers in some of the subject inflators may experience an alteration over time, which could potentially lead to over-aggressive combustion in the event of an air bag deployment. Depending on the circumstances, this potential condition could create excessive internal pressure when the air bag is deployed, which could result in the body of the inflator rupturing upon deployment. Based upon Takata's investigation to date, the potential for such ruptures may occur in some of the subject inflators after several years of exposure to persistent conditions of high absolute humidity. In addition, this potential for rupturing may also depend on other factors, including manufacturing variability.

In the event of an inflator rupture, metal fragments could pass through the air bag cushion material, which may result in injury or death to vehicle occupants.

6. **Chronological summary of events leading to this determination:**

May 2003 – A PSDI-4 inflator ruptured in a BMW vehicle in Switzerland. After Takata was notified, the investigation determined that the 17-month-old inflator ruptured due to an overloading of propellant in the assembly of the inflator at issue. Takata introduced additional quality control measures designed to avoid such overloading.

May 2004 – A PSDI inflator manufactured in October 2001 ruptured in a Honda vehicle in Alabama. Takata was first notified of the event a year later in May 2005 and received only photographs for analysis. Takata tentatively concluded that the incident may have involved a potentially compromised tape seal on this inflator or possibly an overloading of propellant in the inflator at issue.

2007–2011 – After Takata was notified in late 2007 of a rupture of a PSDI inflator in a Honda vehicle, Takata promptly began an investigation. Following that investigation, in October 2008, Takata recommended that Honda conduct a safety recall to replace certain PSDI inflators, and Honda did so. Based on further investigation and additional information developed by Takata, Honda expanded its initial recall on several occasions to cover all vehicles containing PSDI inflators manufactured prior to December 1, 2001.

2010–Present – Beginning in 2010 and at different periods thereafter, in connection with its investigation into reports of inflator ruptures, Takata has consulted with the Fraunhofer Institute for Chemical Technology ("Fraunhofer ICT") to provide an independent research investigation of the root cause of the inflator ruptures. Fraunhofer ICT conducts research for government and industry and its core competencies include

3

energetic materials and energetic systems. Fraunhofer ICT is considered the leading research organization within the pyrotechnic gas generator and airbag system industry.

September 2013 – Takata became aware of a rupture of a PSDI driver inflator in a Honda vehicle in Florida that was not covered by the prior Honda recalls. Takata immediately commenced an additional investigation.

December 2013 – April 2015 – Takata was informed of eight additional incidents in which PSDI and PSDI-4 driver inflators not covered by the prior Honda recalls had ruptured. These eight additional field incidents occurred in the following States: Florida (6), California (1), and North Carolina (1).

June 11, 2014 – Takata sent a letter to NHTSA stating that, consistent with the fact that Takata's highest priority is safety, and in light of the Company's desire to address potential safety concerns promptly and thoroughly, Takata would support NHTSA's request for regional field actions to replace PSDI and PSDI-4 inflators manufactured between January 1, 2004 and June 30, 2007, that were installed in vehicles sold in or registered in Puerto Rico, Florida, Hawaii, and the U.S. Virgin Islands, based on the high levels of absolute humidity in those areas. (Those regional field actions also covered certain passenger inflators.) The five vehicle manufacturers that had installed these driver inflators promptly agreed to conduct the requested regional field actions and to send the replaced inflators to Takata for testing.

June 11, 2014 – Based on six field ruptures of Takata inflators (three driver inflators and three passenger inflators), NHTSA opened a defect investigation, PE14-016. On March 2, 2015, that investigation was upgraded to EA15-001.

September 2014 – May 2015 – As part of its continuing investigation, Takata has conducted extensive testing of inflators returned by the vehicle manufacturers. This testing has included (but has not been limited to) ballistic tests, live dissections, propellant analysis for moisture, chemical analysis, air and helium leak testing, and CT scanning. As of May 1, 2015, Takata has ballistically tested 174 PSDI inflators and 12,464 PSDI-4 and PSDI-4K inflators. None (zero) of the PSDI inflators ruptured during this testing, and nine (9) of the PSDI-4 and PSDI-4K inflators ruptured during this testing, yielding a rupture rate for the PSDI-4 and PSDI-4K inflators of 0.0722 percent. Six (6) of the ruptured inflators were returned from Florida, two (2) from Puerto Rico, and one (1) from non-coastal Georgia.

Although the Company's testing and investigation is ongoing, with the aid of the independent research performed by Fraunhofer ICT, Takata has reached some preliminary conclusions. It appears that the inflator ruptures have a multi-factor root cause that includes the slow-acting effects of a persistent and long term exposure to climates with high temperatures and high absolute humidity. Exposure over a period of several years to persistent levels of high absolute humidity outside the inflator, combined with the effects of thermal cycling, may lead to moisture intrusion in some inflators by

TK HOLDINGS INC.
May 18, 2015

means of diffusion or permeation. Fraunhofer ICT has identified the possibility in these climates for moisture intrusion into the inflator over time and a process by which the moisture may slowly increase the porosity of the propellant within the inflator. Fraunhofer ICT's analysis also indicates that the design of the inflator and the grain (shape) of the propellant can affect the likelihood that the porosity change will occur. In addition, the analysis to date suggests that the potential for this long-term phenomenon to occur was not within the scope of the testing specifications prescribed by the vehicle manufacturers to Takata for the validation and production of the subject inflators as original equipment.

The results of the Fraunhofer ICT research and the Takata testing to date are consistent with the location and age of the inflators that have ruptured in the field and in Takata's testing.

May 2015 – Based upon the results of its investigation and the preliminary conclusions identified above, as well as NHTSA's insistence that action be taken to mitigate the risk posed to safety by these inflators, Takata decided to submit this Defect Information Report.

7.    **Description of the remedy program:**

Consistent with the Consent Order issued by NHTSA on or about May 18, 2015, Takata shall cooperate with NHTSA in all future regulatory actions and proceedings pursuant to NHTSA's authority under the National Traffic and Motor Vehicle Safety Act, or any regulations thereunder, including 49 U.S.C. § 30120(c)(3), regarding the organization and prioritization of replacement air bag inflators.

At the present time, Takata continues to produce a small number of PSDI-4 inflators for use as remedy parts. Takata intends to cease production of the subject inflators, including for use as remedy parts.

Consistent with the above, including Takata's discussions with NHTSA, Takata's preliminary recommendation for the remedy program for the subject inflators is to use a phased customer notification and remedy approach. Under this approach, Takata plans to work with the manufacturers of the vehicles in which the subject inflators were installed to implement appropriate recalls to replace the subject inflators in four stages over time, as outlined here:

- First, vehicles sold in or ever registered in any part of Florida, Puerto Rico, the U.S. Virgin Islands, Hawaii, the Outlying U.S. Territories, Texas, Louisiana, Georgia, South Carolina, Alabama, Mississippi, California, Oklahoma, North Carolina, Virginia, Arkansas, Kentucky, Tennessee, Illinois, Delaware, Maryland, and Missouri, and containing subject inflators manufactured between the start of production and December 31, 2007;

5

**TK HOLDINGS INC.**
**May 18, 2015**

- Second, vehicles sold in or ever registered in any part of Florida, Puerto Rico, the U.S. Virgin Islands, Hawaii, the Outlying U.S. Territories, Texas, Louisiana, Georgia, South Carolina, Alabama, Mississippi, California, Oklahoma, North Carolina, Virginia, Arkansas, Kentucky, Tennessee, Illinois, Delaware, Maryland, and Missouri, and containing subject inflators manufactured between the start of production and December 31, 2011;

- Third, vehicles sold in or ever registered in any other States not listed above and containing subject inflators manufactured between the start of production and December 31, 2007; and

- Fourth, any remaining vehicles not listed above that contain the subject inflators, including subject inflators previously installed as remedy parts.

May 18, 2015

DEFECT INFORMATION REPORT

TK HOLDINGS INC.

SPI PASSENGER AIR BAG INFLATORS

1.    **Manufacturer's name:**

TK Holdings Inc. ("Takata").

2.    **Items of equipment potentially affected:**

All SPI air bag inflators manufactured by Takata between April 2000 (start of production) and the end of inflator production for vehicle Model Year 2008 that were installed as original equipment in frontal passenger air bag modules in vehicles sold in the United States. This Report contemplates a nationwide recall of the subject inflators.

The scope of the recall contemplated by this Report includes vehicles that were previously recalled under prior recalls, including recall numbers 13V-133, 13V-136, 14V-361, 14V-312, 14V-399, 14V-340, 14V-343, 14V-350, 14V-421, 14V-471, 14V-655, 14V-701, 14V-752, 14V-763, 14V-770, 14V-787, and 15V-226. The inflators described in this Report may have previously been covered under two Defect Information Reports filed by Takata: 13E-017 and 14E-073.

Takata continues to conduct engineering analyses of SPI inflators produced after the end of production for Model Year 2008.

The inflators covered by this determination were installed in vehicles manufactured by the following vehicle manufacturers (listed alphabetically):

Chrysler Group LLC
800 Chrysler Drive
Auburn Hills, MI 48326-2757
Phone: (800) 853-1403

Daimler Trucks North America LLC
4747 N. Channel Avenue
Portland, OR 97217-3849
Phone: (503) 745-8000

TK HOLDINGS INC.
May 18, 2015

Ford Motor Company
330 Town Center Drive
Dearborn, MI 48126-2738
Phone: (866) 436-7332

General Motors LLC
3001 Van Dyke Road
Warren, MI 48090-9020
Phone: (313) 556-5000

Mitsubishi Motors North America, Inc.
6400 Katella Avenue
Cypress CA 90630
Phone: (714) 372-6000

Nissan North America, Inc.
One Nissan Way
Franklin, TN 37068
Phone: (615) 725-1000

Subaru of America, Inc.
P.O. Box 6000
Cherry Hill, NJ 08034-6000
Phone: (856) 488-8500

Toyota Motor Engineering & Manufacturing
19001 South Western Ave.
Torrance, CA 90501
Phone: (800) 331-4331

3. **Total number of items of equipment potentially affected:**

Takata manufactured approximately 7.7 million SPI inflators for the North American market during the date range covered by this Report. Of that number, Takata estimates that approximately 2.8 million were subject to previous recalls and safety campaigns. Although Takata knows how many subject inflators it sold to each of the vehicle manufacturers identified above during the relevant period, it does not know precisely how many of those inflators were installed in vehicles that were sold in or registered in the United States. More precise information can be supplied by the vehicle manufacturers.

**TK HOLDINGS INC.**
**May 18, 2015**

4.  **Approximate percentage of items of equipment estimated to actually contain the defect:**

The number of field incidents known to Takata involving ruptures of the subject inflators in the United States is eight (8). Of those field incidents, four (4) involved inflators that were subject to previous recalls. For comparison purposes, Takata estimates that there have been approximately 202,125 total field deployments of SPI subject inflators in the United States. That estimate is based on the number of subject inflators described in section 3, an estimate of the average age of the subject inflators in the field (10.5 years), and an estimate that an average of 0.25 percent of passenger air bags deploy in the field each year. In addition, as described below, since September 2014, Takata has conducted ballistic testing of a selected population of subject inflators returned by vehicle manufacturers, including a disproportionate number of subject inflators returned from areas of high absolute humidity; that ballistic testing to date has resulted in fifty-six (56) ruptures (approximately 0.9 percent) of the subject inflators tested.

5.  **Description of the defect:**

As a result of the developments and circumstances described below and in section 4 above, Takata has determined that a defect related to motor vehicle safety may arise in some of the subject inflators.

The propellant wafers in some of the subject inflators may experience an alteration over time, which could potentially lead to over-aggressive combustion in the event of an air bag deployment. Depending on the circumstances, this potential condition could create excessive internal pressure when the air bag is deployed, which could result in the body of the inflator rupturing upon deployment. Based upon Takata's investigation to date, the potential for such ruptures may occur in some of the subject inflators after several years of exposure to persistent conditions of high absolute humidity. In addition, Takata's test results and investigation indicate that this potential for rupturing may also depend on other factors, including vehicle design factors and manufacturing variability.

Takata is also aware of a potential issue associated with the inflator body internal tape seals on some SPI inflators. During its investigation, Takata observed a small number of tape seal leaks in SPI inflators manufactured prior to 2007. These leaks were discovered during leak testing in 2014, as part of the Takata returned-inflator evaluation program. Leaks have been found in SPI inflators returned from several of the vehicle manufacturers listed in section 2. Such a leak can increase the potential for moisture to reach the main propellant wafers, possibly in areas outside of the highest absolute humidity States.

In the event of an inflator rupture, metal fragments could pass through the air bag cushion material, which may result in injury or death to vehicle occupants.

**TK HOLDINGS INC.**
**May 18, 2015**

6.    **Chronological summary of events leading to this determination:**

May 2009–March 2010 – Four SPI inflators ruptured in auto recycling centers in Japan.

October 2011 – Takata was first notified of a reported field rupture involving an SPI inflator in a Toyota vehicle in Japan.

October or November 2011 – Takata was notified of a rupture of a PSPI passenger inflator in a model year 2001 Honda Civic vehicle located in Puerto Rico. Takata promptly began an investigation.

2010–Present – Beginning in 2010 and at different periods thereafter, in connection with its investigation, Takata has consulted with the Fraunhofer Institute for Chemical Technology ("Fraunhofer ICT") to provide an independent research investigation of the root cause of the inflator ruptures. Fraunhofer ICT conducts research for government and industry and its core competencies include energetic materials and energetic systems. Fraunhofer ICT is considered the leading research organization within the pyrotechnic gas generator and airbag system industry.

August 2012 – November 2012 – Takata was informed of three additional field rupture incidents in the United States, two in Puerto Rico and one in Maryland (the Maryland vehicle had previously been operated in Florida for eight years). These incidents all occurred in Toyota Corolla vehicles and involved PSPI-L inflators.

April 2013 – Based on its investigation, Takata submitted a defect information report ("DIR"), identified by NHTSA as 13E-017, which covered certain passenger inflators containing propellant wafers manufactured at Takata's Moses Lake, Washington plant during the period from April 13, 2000 through September 11, 2002, and certain air bag inflators manufactured at Takata's Monclova, Mexico plant during the period from October 4, 2001 through October 31, 2002. Promptly thereafter, the five manufacturers of vehicles in which those inflators had been installed submitted corresponding DIRs and recalled those vehicles: 13V-130 (Mazda); 13V-132 (Honda); 13V-133 (Toyota); 13V-136 (Nissan); and 13V-172 (BMW).

June 2014 – Takata notified the vehicle manufacturers that some of its traceability records were incomplete (*i.e.*, Takata could not identify with absolute certainty the propellant lots from which the propellant wafers in a specific inflator were taken), and that it was possible for propellant wafers to have been stored at its Monclova plant for up to three months before being used in an inflator. Based on those findings, and to assure that all potentially affected inflators were covered, Takata recommended that all PSPI, PSPI-L, and SPI inflators built through the end of 2002 should be recalled. Based on that recommendation, the five vehicle manufacturers identified above decided to expand their 2013 recalls: 14V-312 (Toyota); 14V-349 (Honda); 14V-361 (Nissan); 14V-362 (Mazda); and 14V-428 (BMW). In addition, based on the expanded date range for the covered inflators, Fuji Heavy Industries (Subaru) submitted a similar DIR covering a

4

relatively small number of vehicles (14V-399). Subaru was not affected by the original date range in 13E-017.

June 11, 2014 – Takata sent a letter to NHTSA stating that, consistent with the fact that Takata's highest priority is safety, and in light of the Company's desire to address potential safety concerns promptly and thoroughly, Takata would support NHTSA's request for regional field actions to replace PSPI, PSPI-L, and SPI passenger inflators manufactured between the start of production in April 2000 and July 31, 2004 that were installed in vehicles sold in or registered in Puerto Rico, Florida, Hawaii, and the U.S. Virgin Islands, based on the high levels of absolute humidity in those areas. (Those regional field actions also covered certain driver inflators.) The 10 vehicle manufacturers that had installed these passenger inflators in their vehicles promptly agreed to conduct the requested regional field actions and to send the replaced inflators to Takata for testing.

June 11, 2014 – Based on six field ruptures of Takata inflators (three driver inflators and three passenger inflators), NHTSA opened a defect investigation, PE14-016. On March 2, 2015, that investigation was upgraded to EA15-001.

April 2014 – April 2015 – Takata was informed of seven additional incidents in which passenger inflators not covered by the prior recalls had ruptured. Three of these involved SPI inflators installed in Nissan Sentra vehicles. Two of these incidents occurred in Florida and the remaining incident occurred in Louisiana.

October – December 2014 – At the request of NHTSA, Toyota, Honda, and Nissan submitted DIRs covering vehicles with the passenger inflators covered by the regional field actions identified above that had been sold in or registered in a wider geographical area, including Puerto Rico, Hawaii, the U.S. Virgin Islands, Guam, Saipan, American Samoa, Florida and adjacent counties in southern Georgia, as well as the coastal areas of Alabama, Louisiana, Mississippi and Texas. On November 17, 2014, Takata submitted DIR 14E-073. Subsequently, in December 2014, several other vehicle manufacturers submitted DIRs with respect to regional recalls covering vehicles with the identified inflators that had been sold in or registered in those areas.

September 2014 – May 2015 – As part of its continuing investigation, Takata has conducted extensive testing of inflators returned by the vehicle manufacturers. This testing includes (but is not limited to) ballistic tests, live dissections, propellant analysis for moisture, chemical analysis, air and helium leak testing, and CT scanning. As of May 1, 2015, Takata has ballistically tested 5,911 SPI passenger inflators. Of those inflators, 56 ruptured during this testing, yielding a rupture rate of 0.9 percent. All of these test ruptures involved inflators returned from the States identified in the prior paragraph, except two (one returned from Oregon and one returned from Pennsylvania) that were subject to previous recalls.

Although the Company's testing and investigation is ongoing, with the aid of the independent research performed by Fraunhofer ICT, Takata has reached some preliminary conclusions. It appears that the inflator ruptures have a multi-factor root cause that includes the slow-acting effects of a persistent and long term exposure to climates with high temperatures and high absolute humidity. Exposure over a period of several years to persistent levels of high absolute humidity outside the inflator, combined with the effects of thermal cycling, may lead to moisture intrusion in some inflators by means of diffusion or permeation. Fraunhofer ICT has identified the possibility in these climates for moisture intrusion into the inflator over time and a process by which the moisture may slowly increase the porosity of the propellant within the inflator. Fraunhofer ICT's analysis also indicates that the design of the inflator and the grain (shape) of the propellant can affect the likelihood that the porosity change will occur, as can manufacturing variability. The results of the Fraunhofer ICT research to date are consistent with the geographic location and age of the inflators that have ruptured in the field and in Takata's testing. Takata's testing also indicates that the design of the vehicle and the design of the air bag module are associated with differences in outcomes.

In addition, the analysis to date suggests that the potential for this long-term phenomenon to occur was not within the scope of the testing specifications prescribed by the vehicle manufacturers for the validation and production of the subject inflators as original equipment.

In addition, as part of its investigation, Takata conducted air leak tests and helium leak tests on certain inflators. Leak testing started in November 2014 as part of Takata's returned-inflator evaluation program. Through May 1, 2015, Takata has identified a high leak rate in 28 out of 1027 SPI inflators tested. The cause of these leaks is still under investigation, but it appears to be due, in part, to an adhesion failure of the tape seal that occurs after long-term environmental exposure. No leaks have been observed in any inflators manufactured after 2004.

May 2015 – Based upon the results of its investigation and the preliminary conclusions identified above, as well as NHTSA's insistence that action be taken to mitigate the risk posed to safety by these inflators, Takata decided to submit this Defect Information Report. In particular, in an abundance of caution and to address practical considerations relating to the administration of the remedy program for the United States, Takata agreed to extend the scope of the present Report through inflator production for Model Year 2008 at the insistence of NHTSA.

7.     **Description of the remedy program:**

Consistent with the Consent Order issued by NHTSA on or about May 18, 2015, Takata shall cooperate with NHTSA in all future regulatory actions and proceedings pursuant to NHTSA's authority under the National Traffic and Motor Vehicle Safety Act, or any regulations thereunder, including 49 U.S.C. § 30120(c)(3), regarding the organization and prioritization of replacement air bag inflators.

**TK HOLDINGS INC.**
**May 18, 2015**

At this time and consistent with the above, including Takata's discussions with NHTSA, Takata's preliminary recommendation for the remedy program for the subject inflators is to use a phased customer notification and remedy approach. Under this approach, Takata plans to work with the manufacturers of the vehicles in which the subject inflators were installed to implement appropriate recalls to replace the subject inflators in four stages, based on the order of production with the oldest inflators being remedied first.

**May 18, 2015**

**DEFECT INFORMATION REPORT**

**TK HOLDINGS INC.**

**PSPI-L PASSENGER AIR BAG INFLATORS**

1. **Manufacturer's name:**

   TK Holdings Inc. ("Takata").

2. **Items of equipment potentially affected:**

   All PSPI-L air bag inflators installed as original equipment in frontal passenger air bag modules in specific vehicle models sold in the United States, as follows:

   > Model Years 2004-2007 Honda Accord vehicles
   > Model Years 2003-2007 Toyota Corolla vehicles
   > Model Years 2003-2007 Toyota Matrix vehicles
   > Model Years 2003-2007 Pontiac Vibe vehicles

   This Report contemplates the potential for a national recall, subject to the determinations of NHTSA and consultations with the affected vehicle manufacturers, as described in section 7 below. The recall contemplated in this Report would be in addition to the previous recalls and safety campaigns involving these inflators, including recall numbers 13V-132, 13V-133, 14V-312, 14V-349, 14V-353, 14V-655, and 14V-700. Takata previously filed Defect Information Reports 13E-017 and 14E-073 relating to the subject inflators.

   Takata continues to conduct engineering analyses of other PSPI-L inflators, including those produced after the end of production for Model Year 2007.

   The inflators covered by this determination were installed as original equipment in vehicles manufactured by the following vehicle manufacturers (listed alphabetically):

   > American Honda Motor Co.
   > 1919 Torrance Blvd.
   > Torrance, CA 90501-2746
   > Phone: (310) 783-2000
   >
   > General Motors LLC
   > 30001 Van Dyke Road
   > Warren, MI 48090-9020
   > Phone: (313) 556-5000

**TK HOLDINGS INC.**
**May 18, 2015**

Toyota Motor Engineering & Manufacturing
19001 South Western Ave.
Torrance, CA 90501
Phone: (800) 331-4331

3. **Total number of items of equipment potentially affected:**

The total number of subject inflators potentially affected on a national basis in the vehicle models identified above is approximately 5.2 million. Of that number, Takata estimates that approximately 1.1 million are subject to previous recalls and safety campaigns.

4. **Approximate percentage of items of equipment estimated to actually contain the defect:**

The number of field incidents known to Takata involving ruptures of the subject inflators in the United States is ten (10). Of those field ruptures, four (4) involved inflators that were subject to previous recalls. For comparison purposes, Takata estimates that there have been approximately 143,000 total field deployments of the subject inflators in the United States. That estimate is based on the number of subject inflators described in section 3, an estimate of the average age of the subject inflators in the field (11 years), and an estimate that an average of 0.25 percent of passenger air bags deploy in the field each year. In addition, as described below, since September 2014, Takata has conducted ballistic testing of a selected population of subject inflators returned by the vehicle manufacturers, including a disproportionate number of subject inflators returned from areas of high absolute humidity; that ballistic testing to date has resulted in 180 ruptures (approximately 2.16 percent) of the subject inflators tested.

5. **Description of the defect:**

As a result of the developments and circumstances described below and in section 4 above, Takata has determined that a defect related to motor vehicle safety may arise in some of the subject inflators.

The propellant wafers in some of the subject inflators may experience an alteration over time, which could potentially lead to over-aggressive combustion in the event of an air bag deployment. Depending on the circumstances, this potential condition could create excessive internal pressure when the air bag is deployed, which could result in the body of the inflator rupturing upon deployment. Based upon Takata's investigation to date, the potential for such ruptures may occur in some of the subject inflators after several years of exposure to persistent conditions of high absolute humidity. In addition, Takata's test results indicate that even with identical inflator designs, the likelihood of a potential rupture is greater in certain vehicle models, including the models identified above, due to factors that have not yet been identified. The potential for rupture may also be influenced by other factors, including manufacturing variability.

2

TK HOLDINGS INC.
May 18, 2015

In the event of an inflator rupture, metal fragments could pass through the air bag cushion material, which may result in injury or death to vehicle occupants.

6. **Chronological summary of events leading to this determination:**

October or November 2011 – Takata was notified of a rupture of a PSPI passenger inflator in a model year 2001 Honda Civic vehicle located in Puerto Rico. Takata promptly began an investigation.

2010–Present – Beginning in 2010 and at different periods thereafter, in connection with its investigation, Takata has consulted with the Fraunhofer Institute for Chemical Technology ("Fraunhofer ICT") to provide an independent research investigation of the root cause of the inflator ruptures. Fraunhofer ICT conducts research for government and industry and its core competencies include energetic materials and energetic systems. Fraunhofer ICT is considered the leading research organization within the pyrotechnic gas generator and airbag system industry.

August 2012 – November 2012 – Takata was informed of three additional incidents in the United States (two in Puerto Rico and one in Maryland (the Maryland vehicle had previously been operated in Florida for eight years)). These incidents all occurred in Honda Civic or Toyota Corolla vehicles.

April 2013 – Based on its investigation, Takata submitted a defect information report ("DIR"), identified by NHTSA as 13E-017, which covered certain passenger inflators containing propellant wafers manufactured at Takata's Moses Lake, Washington plant during the period from April 13, 2000 through September 11, 2002, and certain air bag inflators manufactured at Takata's Monclova, Mexico plant during the period from October 4, 2001 through October 31, 2002. Promptly thereafter, the five manufacturers of vehicles in which those inflators had been installed submitted corresponding DIRs and recalled those vehicles: 13V-130 (Mazda); 13V-132 (Honda); 13V-133 (Toyota); 13V-136 (Nissan); and 13V-172 (BMW).

June 2014 – Takata notified the vehicle manufacturers that some of its traceability records were incomplete (*i.e.*, Takata could not identify with absolute certainty the propellant lots from which the propellant wafers in a specific inflator were taken), and that it was possible for propellant wafers to have been stored at its Monclova plant for up to three months before being used in an inflator. Based on those findings, and to assure that all potentially affected inflators were covered, Takata recommended that all PSPI, PSPI-L, and SPI inflators built through the end of 2002 should be recalled. Based on that recommendation, the five vehicle manufacturers identified above decided to expand their 2013 recalls: 14V-312 (Toyota); 14V-349 (Honda); 14V-361 (Nissan); 14V-362 (Mazda); and 14V-428 (BMW). In addition, based on the expanded date range for the covered inflators, Fuji Heavy Industries (Subaru) submitted a similar DIR covering a

3

relatively small number of vehicles (14V-399). Subaru was not affected by the original date range in 13E-017.

June 11, 2014 – Takata sent a letter to NHTSA stating that, consistent with the fact that Takata's highest priority is safety, and in light of the Company's desire to address potential safety concerns promptly and thoroughly, Takata would support NHTSA's request for regional field actions to replace PSPI, PSPI-L, and SPI passenger inflators manufactured between the start of production in April 2000 and July 31, 2004 that were installed in vehicles sold in or registered in Puerto Rico, Florida, Hawaii, and the U.S. Virgin Islands, based on the high levels of absolute humidity in those areas. (Those regional field actions also covered certain driver inflators.) The 10 vehicle manufacturers that had installed these passenger inflators in their vehicles promptly agreed to conduct the requested regional field actions and to send the replaced inflators to Takata for testing.

June 11, 2014 – Based on six field ruptures of Takata inflators (three driver inflators and three passenger inflators), NHTSA opened a defect investigation, PE14-016. On March 2, 2015, that investigation was upgraded to EA15-001.

April 2014 – April 2015 – Takata was informed of seven additional incidents in which passenger inflators not covered by the prior recalls had ruptured. Four of these involved PSPI-L inflators installed in Toyota Corolla vehicles. Three of these incidents occurred in Puerto Rico and the remaining incident occurred in Texas.

October – December 2014 – At the request of NHTSA, Toyota, Honda, and Nissan submitted DIRs covering vehicles with the passenger inflators covered by the regional field actions identified above that had been sold in or registered in a wider geographical area, including Puerto Rico, Hawaii, the U.S. Virgin Islands, Guam, Saipan, American Samoa, Florida and adjacent counties in southern Georgia, as well as the coastal areas of Alabama, Louisiana, Mississippi and Texas. On November 17, 2014, Takata submitted DIR 14E-073. Subsequently, in December 2014, several other vehicle manufacturers submitted DIRs with respect to regional recalls covering vehicles with the identified inflators that had been sold in or registered in those areas.

September 2014 – May 2015 – As part of its continuing investigation, Takata has conducted extensive testing of inflators returned by the vehicle manufacturers. This testing has included (but has not been limited to) ballistic tests, live dissections, propellant analysis for moisture, chemical analysis, air and helium leak testing, and CT scanning. As of May 1, 2015, Takata has ballistically tested 8,320 PSPI-L inflators from the affected vehicle manufacturers, including inflators installed in vehicle models not covered by this report. Of those inflators, 180 ruptured during this testing, yielding a rupture rate of 2.16 percent. All but three of these test ruptures involved inflators returned from the high absolute humidity States listed in the first stage of the remedy program described in section 7 below. The remaining three test ruptures involved inflators returned from Illinois (2) and Kentucky (1), but the information available to

4

Takata indicates that these three inflators were removed from vehicles that had been registered for several years in Florida or coastal Texas.

Although the Company's testing and investigation is ongoing, with the aid of the independent research performed by Fraunhofer ICT, Takata has reached some preliminary conclusions. It appears that the inflator ruptures have a multi-factor root cause that includes the slow-acting effects of a persistent and long-term exposure to climates with high temperatures and high absolute humidity. Exposure over a period of several years to persistent levels of high absolute humidity outside the inflator, combined with the effects of thermal cycling, may lead to moisture intrusion in some inflators by means of diffusion or permeation. Fraunhofer ICT has identified the possibility in these climates for moisture intrusion into the inflator over time and a process by which the moisture may slowly increase the porosity of the propellant within the inflator. Fraunhofer ICT's analysis also indicates that the design of the inflator and the grain (shape) of the propellant can affect the likelihood that the porosity change will occur, as can manufacturing variability. The results of the Fraunhofer ICT research date are consistent with the geographic location and age of the inflators that have ruptured in the field and in Takata's testing.

Takata's testing indicates that vehicle and model design differences are associated with differences in outcomes. Significantly, Takata's test results indicate that the likelihood of a potential rupture is greater in the vehicle models identified in this report, due to as-yet unidentified factors.

In addition, the analysis to date suggests that the potential for this long-term phenomenon to occur was not within the scope of the testing specifications prescribed by the vehicle manufacturers for the validation and production of the subject inflators as original equipment.

May 2015 – Based upon the results of its investigation and the preliminary conclusions identified above, as well as NHTSA's insistence that action be taken to mitigate the risk posed to safety by these inflators, Takata decided to submit this Report.

7. **Description of the remedy program:**

Consistent with the Consent Order issued by NHTSA on or about May 18, 2015 (the "Consent Order"), Takata shall cooperate with NHTSA in all future regulatory actions and proceedings pursuant to NHTSA's authority under the National Traffic and Motor Vehicle Safety Act, or any regulations thereunder, including 49 U.S.C. § 30120(c)(3), regarding the organization and prioritization of replacement air bag inflators.

Pursuant to the Consent Order, Takata will continue to test the subject inflator type in all makes, models, and model years of vehicles that are covered by a safety campaign or otherwise made available or obtained by Takata for testing, and Takata will report those results to NHTSA.

Consistent with paragraphs 4 and 9 of the Consent Order, this Report recommends and contemplates that the remedy program for the subject inflators is to use a phased customer notification and remedy approach. Under that approach, Takata plans to work with the manufacturers of the vehicles in which the subject inflators were installed to implement appropriate recalls to replace the subject inflators first in high absolute humidity States, with any further expansion of the remedy program to proceed by geographic zones, contingent on subsequent orders that may be issued by NHTSA based on the results of further testing and engineering analysis of the subject inflators and following consultation with Takata and the affected vehicle manufacturers, as follows:

- The initial recall contemplated by this Report and the Consent Order would include the vehicle models listed in section 2 that were sold in or ever registered in any part of Florida, Puerto Rico, the U.S. Virgin Islands, Hawaii, the Outlying U.S. Territories, Texas, Louisiana, Georgia, South Carolina, Alabama, and Mississippi;

- Pursuant to the Consent Order, if ordered by NHTSA based on the results of further testing and engineering analysis of the subject inflators and following consultation with Takata and the affected vehicle manufacturers, the recall contemplated by this Report and the Consent Order would expand to include the vehicle models listed in section 2 that were sold in or ever registered in any part of California, Oklahoma, North Carolina, Virginia, Arkansas, Kentucky, Tennessee, Illinois, Delaware, Maryland, and Missouri;

- Pursuant to the Consent Order, if ordered by NHTSA based on the results of further testing and engineering analysis of the subject inflators and following consultation with Takata and the affected vehicle manufacturers, the recall contemplated by this Report and the Consent Order would expand to include the vehicle models listed in section 2 that were sold in or ever registered in any part of Ohio, Indiana, New Jersey, West Virginia, the District of Columbia, Kansas, Pennsylvania, Washington, Massachusetts, Connecticut, Michigan, New York, Rhode Island, Oregon, Iowa, and Nebraska; and

- Pursuant to the Consent Order, if ordered by NHTSA based on the results of further testing and engineering analysis of the subject inflators and following consultation with Takata and the affected vehicle manufacturers, the recall contemplated by this Report and the Consent Order would expand to include the vehicle models listed in section 2 that were sold in or ever registered in any of the remaining States.

May 18, 2015

DEFECT INFORMATION REPORT

TK HOLDINGS INC.

PSPI PASSENGER AIR BAG INFLATORS

1.  **Manufacturer's name:**

    TK Holdings Inc. ("Takata").

2.  **Items of equipment potentially affected:**

    All PSPI air bag inflators installed as original equipment in frontal passenger air bag modules in specific vehicle models sold in the United States, as follows:

    > Model Year 2003 Honda Accord vehicles
    > Model Years 2001-2006 Honda Civic vehicles

    The above represents all Model Years of the listed vehicle makes and models that contain PSPI inflators.

    This Report contemplates the potential for a national recall, subject to the determinations of NHTSA and consultations with the vehicle manufacturer, as described in section 7 below. The recall contemplated in this Report would be in addition to the previous recalls and safety campaigns involving these inflators, including recall numbers 13V-132, 14V-349, 14V-353, and 14V-700. Takata previously filed Defect Information Reports 13E-017 and 14E-073 relating to the subject inflators.

    The inflators covered by this determination were installed as original equipment in vehicles manufactured by the following vehicle manufacturer:

    > American Honda Motor Co.
    > 1919 Torrance Blvd.
    > Torrance, CA 90501-2746
    > Phone: (310) 783-2000

3.  **Total number of items of equipment potentially affected:**

    The total number of subject inflators potentially affected on a national basis in the vehicle models identified above is approximately 3.3 million. Of that number, Takata estimates that approximately 2.1 million are subject to previous recalls and safety campaigns.

**TK HOLDINGS INC.**
**May 18, 2015**

4.    **Approximate percentage of items of equipment estimated to actually contain the defect:**

The number of field incidents known to Takata involving ruptures of the subject inflators in the United States is three (3), all of which involved inflators that were subject to previous recalls. For comparison purposes, Takata estimates that there have been approximately 94,875 total field deployments of the subject inflators in the United States. That estimate is based on the number of subject inflators described in section 3, an estimate of the average age of the subject inflators in the field (11.5 years), and an estimate that an average of 0.25 percent of passenger air bags deploy in the field each year. In addition, as described below, since September 2014, Takata has conducted ballistic testing of a selected population of subject inflators returned by Honda, including a disproportionate number of subject inflators returned from areas of high absolute humidity; that ballistic testing to date has resulted in twenty (20) ruptures (approximately 0.51 percent) of the subject inflators tested.

5.    **Description of the defect:**

As a result of the developments and circumstances described below and in section 4 above, Takata has determined that a defect related to motor vehicle safety may arise in some of the subject inflators.

The propellant wafers in some of the subject inflators may experience an alteration over time, which could potentially lead to over-aggressive combustion in the event of an air bag deployment. Depending on the circumstances, this potential condition could create excessive internal pressure when the air bag is deployed, which could result in the body of the inflator rupturing upon deployment. Based upon Takata's investigation to date, the potential for such ruptures may occur in some of the subject inflators after several years of exposure to persistent conditions of high absolute humidity. In addition, Takata's test results indicate that even with identical inflator designs, the likelihood of a potential rupture is greater in certain vehicle models, including the models identified above, due to factors that have not yet been identified. The potential for rupture may also be influenced by other factors, including manufacturing variability.

In the event of an inflator rupture, metal fragments could pass through the air bag cushion material, which may result in injury or death to vehicle occupants.

6.    **Chronological summary of events leading to this determination:**

October or November 2011 – Takata was notified of a rupture of a PSPI passenger inflator in a model year 2001 Honda Civic vehicle located in Puerto Rico. Takata promptly began an investigation.

2010–Present – Beginning in 2010 and at different periods thereafter, in connection with its investigation, Takata has consulted with the Fraunhofer Institute for Chemical

Technology ("Fraunhofer ICT") to provide an independent research investigation of the root cause of the inflator ruptures. Fraunhofer ICT conducts research for government and industry and its core competencies include energetic materials and energetic systems. Fraunhofer ICT is considered the leading research organization within the pyrotechnic gas generator and airbag system industry.

August 2012 – November 2012 – Takata was informed of three additional incidents in the United States (two in Puerto Rico and one in Maryland (the Maryland vehicle had previously been operated in Florida for eight years)). These incidents all occurred in Honda Civic or Toyota Corolla vehicles.

April 2013 – Based on its investigation, Takata submitted a defect information report ("DIR"), identified by NHTSA as 13E-017, which covered certain passenger inflators containing propellant wafers manufactured at Takata's Moses Lake, Washington plant during the period from April 13, 2000 through September 11, 2002, and certain air bag inflators manufactured at Takata's Monclova, Mexico plant during the period from October 4, 2001 through October 31, 2002. Promptly thereafter, the five manufacturers of vehicles in which those inflators had been installed submitted corresponding DIRs and recalled those vehicles: 13V-130 (Mazda); 13V-132 (Honda); 13V-133 (Toyota); 13V-136 (Nissan); and 13V-172 (BMW).

June 2014 – Takata notified the vehicle manufacturers that some of its traceability records were incomplete (*i.e.*, Takata could not identify with absolute certainty the propellant lots from which the propellant wafers in a specific inflator were taken), and that it was possible for propellant wafers to have been stored at its Monclova plant for up to three months before being used in an inflator. Based on those findings, and to assure that all potentially affected inflators were covered, Takata recommended that all PSPI, PSPI-L, and SPI inflators built through the end of 2002 should be recalled. Based on that recommendation, the five vehicle manufacturers identified above decided to expand their 2013 recalls: 14V-312 (Toyota); 14V-349 (Honda); 14V-361 (Nissan); 14V-362 (Mazda); and 14V-428 (BMW). In addition, based on the expanded date range for the covered inflators, Fuji Heavy Industries (Subaru) submitted a similar DIR covering a relatively small number of vehicles (14V-399). Subaru was not affected by the original date range in 13E-017.

June 11, 2014 – Takata sent a letter to NHTSA stating that, consistent with the fact that Takata's highest priority is safety, and in light of the Company's desire to address potential safety concerns promptly and thoroughly, Takata would support NHTSA's request for regional field actions to replace PSPI, PSPI-L, and SPI passenger inflators manufactured between the start of production in April 2000 and July 31, 2004 that were installed in vehicles sold in or registered in Puerto Rico, Florida, Hawaii, and the U.S. Virgin Islands, based on the high levels of absolute humidity in those areas. (Those regional field actions also covered certain driver inflators.) The 10 vehicle manufacturers that had installed these passenger inflators in their vehicles promptly agreed to conduct

3

the requested regional field actions and to send the replaced inflators to Takata for testing.

June 11, 2014 – Based on six field ruptures of Takata inflators (three driver inflators and three passenger inflators), NHTSA opened a defect investigation, PE14-016. On March 2, 2015, that investigation was upgraded to EA15-001.

April 2014 – April 2015 – Takata was informed of seven additional incidents in which passenger inflators not covered by the prior recalls had ruptured. Four of these involved PSPI-L inflators installed in Toyota Corolla vehicles. Three of these incidents occurred in Puerto Rico and the remaining incident occurred in Texas.

October – December 2014 – At the request of NHTSA, Toyota, Honda, and Nissan submitted DIRs covering vehicles with the passenger inflators covered by the regional field actions identified above that had been sold in or registered in a wider geographical area, including Puerto Rico, Hawaii, the U.S. Virgin Islands, Guam, Saipan, American Samoa, Florida and adjacent counties in southern Georgia, as well as the coastal areas of Alabama, Louisiana, Mississippi and Texas. On November 17, 2014, Takata submitted DIR 14E-073. Subsequently, in December 2014, several other vehicle manufacturers submitted DIRs with respect to regional recalls covering vehicles with the identified inflators that had been sold in or registered in those areas.

September 2014 – May 2015 – As part of its continuing investigation, Takata has conducted extensive testing of inflators returned by the vehicle manufacturers. This testing has included (but has not been limited to) ballistic tests, live dissections, propellant analysis for moisture, chemical analysis, air and helium leak testing, and CT scanning. As of May 1, 2015, Takata has ballistically tested 3,932 Honda PSPI inflators. Of those inflators, 20 ruptured during this testing, yielding a rupture rate of 0.51 percent. All of these test ruptures involved inflators returned from the high absolute humidity States listed in the first stage of the remedy program described in section 7 below.

Although the Company's testing and investigation is ongoing, with the aid of the independent research performed by Fraunhofer ICT, Takata has reached some preliminary conclusions. It appears that the inflator ruptures have a multi-factor root cause that includes the slow-acting effects of a persistent and long-term exposure to climates with high temperatures and high absolute humidity. Exposure over a period of several years to persistent levels of high absolute humidity outside the inflator, combined with the effects of thermal cycling, may lead to moisture intrusion in some inflators by means of diffusion or permeation. Fraunhofer ICT has identified the possibility in these climates for moisture intrusion into the inflator over time and a process by which the moisture may slowly increase the porosity of the propellant within the inflator. Fraunhofer ICT's analysis also indicates that the design of the inflator and the grain (shape) of the propellant can affect the likelihood that the porosity change will occur, as can manufacturing variability. The results of the Fraunhofer ICT research to date are

4

consistent with the geographic location and age of the inflators that have ruptured in the field and in Takata's testing.

Takata's testing indicates that vehicle and model design differences are associated with differences in outcomes. Significantly, Takata's test results indicate that the likelihood of a potential rupture is greater in the vehicle models identified in this report, due to as-yet unidentified factors.

In addition, the analysis to date suggests that the potential for this long-term phenomenon to occur was not within the scope of the testing specifications prescribed by the vehicle manufacturers for the validation and production of the subject inflators as original equipment.

May 2015 – Based upon the results of its investigation and the preliminary conclusions identified above, as well as NHTSA's insistence that action be taken to mitigate the risk posed to safety by these inflators, Takata decided to submit this Report.

7.  **Description of the remedy program:**

Consistent with the Consent Order issued by NHTSA on or about May 18, 2015 (the "Consent Order"), Takata shall cooperate with NHTSA in all future regulatory actions and proceedings pursuant to NHTSA's authority under the National Traffic and Motor Vehicle Safety Act, or any regulations thereunder, including 49 U.S.C. § 30120(c)(3), regarding the organization and prioritization of replacement air bag inflators.

Pursuant to the Consent Order, Takata will continue to test the subject inflator type in all makes, models, and model years of vehicles that are covered by a safety campaign or otherwise made available or obtained by Takata for testing, and Takata will report those results to NHTSA.

Consistent with paragraphs 4 and 9 of the Consent Order, this Report recommends and contemplates that the remedy program for the subject inflators is to use a phased customer notification and remedy approach. Under that approach, Takata plans to work with the manufacturer of the vehicles in which the subject inflators were installed (Honda) to implement an appropriate recall to replace the subject inflators first in high absolute humidity States, with any further expansion of the remedy program to proceed by geographic zones, contingent on subsequent orders that may be issued by NHTSA based on the results of further testing and engineering analysis of the subject inflators and following consultation with Takata and the affected vehicle manufacturers, as follows:

- The initial recall contemplated by this Report and the Consent Order would include the vehicle models listed in section 2 that were sold in or ever registered in any part of Florida, Puerto Rico, the U.S. Virgin Islands, Hawaii, the Outlying U.S. Territories, Texas, Louisiana, Georgia, South Carolina, Alabama, and Mississippi;

**TK HOLDINGS INC.**
**May 18, 2015**

- Pursuant to the Consent Order, if ordered by NHTSA based on the results of further testing and engineering analysis of the subject inflators and following consultation with Takata and the affected vehicle manufacturer, the recall contemplated by this Report and the Consent Order would expand to include the vehicle models listed in section 2 that were sold in or ever registered in any part of California, Oklahoma, North Carolina, Virginia, Arkansas, Kentucky, Tennessee, Illinois, Delaware, Maryland, and Missouri;

- Pursuant to the Consent Order, if ordered by NHTSA based on the results of further testing and engineering analysis of the subject inflators and following consultation with Takata and the affected vehicle manufacturer, the recall contemplated by this Report and the Consent Order would expand to include the vehicle models listed in section 2 that were sold in or ever registered in any part of Ohio, Indiana, New Jersey, West Virginia, the District of Columbia, Kansas, Pennsylvania, Washington, Massachusetts, Connecticut, Michigan, New York, Rhode Island, Oregon, Iowa, and Nebraska; and

- Pursuant to the Consent Order, if ordered by NHTSA based on the results of further testing and engineering analysis of the subject inflators and following consultation with Takata and the affected vehicle manufacturer, the recall contemplated by this Report and the consent Order would expand to include the vehicle models listed in section 2 that were sold in or ever registered in any of the remaining States.

# EXHIBIT B

**UNITED STATES DEPARTMENT OF TRANSPORTATION**
**NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION**
1200 New Jersey Avenue SE
Washington, D.C. 20590

| | |
|---|---|
| **In re:** | ) |
| | ) |
| EA15-001 | ) |
| Air Bag Inflator Rupture | ) |
| | ) |
| | ) |

## CONSENT ORDER

This Consent Order is issued pursuant to the authority of the National Highway Traffic Safety Administration ("NHTSA"), an operating administration of the U.S. Department of Transportation, to resolve issues of liability raised in the above-captioned investigation, to mitigate and control risks of harm, and to promote public safety. This Consent Order sets forth the penalties, requirements, and performance obligations agreed to by TK Holdings Inc. ("Takata"), in connection with Takata's alleged failure to fully comply with the requirements of the National Traffic and Motor Vehicle Safety Act of 1966 as amended and recodified (the "Safety Act"), 49 U.S.C. § 30101, *et seq.*, and applicable regulations thereunder, as detailed herein.

The Consent Order of May 18, 2015, issued by NHTSA in this matter and agreed to by Takata, remains in effect and is hereby incorporated by reference, and its terms and conditions are made a part of this Consent Order as if set forth fully herein.

## I.     NATURE OF THE ACTION

1.     The Safety Act provides for regulation of motor vehicles and motor vehicle equipment by the Secretary of Transportation. The Secretary has delegated his authorities under the Safety Act to the NHTSA Administrator, 49 C.F.R. §§ 1.95(a), 501.2(a)(1).

1

2.      The Safety Act and applicable regulations impose certain obligations on manufacturers of motor vehicles and motor vehicle equipment to provide timely notice to NHTSA in particular circumstances where the manufacturer has determined in good faith that its motor vehicles or items of equipment contain a defect related to motor vehicle safety or do not comply with a Federal Motor Vehicle Safety Standard. *See* 49 U.S.C. § 30118(c); 49 C.F.R. § 573.3(e)(f); 49 C.F.R. § 573.6(a). Such notice, in the form of a Defect Information Report, is required not more than five working days after the manufacturer knew or should have known of a potential defect in its motor vehicle or motor vehicle equipment that poses an unreasonable risk to safety, or a non-compliance in its vehicles or equipment. *See* 49 C.F.R. § 573.6(a); *see also United States v. General Motors Corp.*, 656 F. Supp. 1555, 1559 n.5 (D.D.C. 1987); *United States v. General Motors Corp.*, 574 F. Supp. 1047, 1049-50 (D.D.C. 1983).

3.      The Safety Act and applicable regulations impose certain obligations on manufacturers to preserve records that are needed for the proper investigation, and adjudication or other disposition, of possible defects related to motor vehicle safety. 49 U.S.C. § 30166(e); 49 C.F.R. § 576.2. The records to be maintained by manufacturers include documentary materials that contain information concerning malfunctions that may be related to motor vehicle safety. 49 C.F.R. § 576.6. Such malfunctions include any failure in performance that could, in any reasonably foreseeable manner, be a causative factor in, or aggravate, an accident or an injury to a person. 49 C.F.R. § 576.8.

4.      The Safety Act and applicable regulations impose certain obligations on manufacturers to provide timely, accurate, and complete information and cooperation in response to requests from NHTSA in connection with the investigation of potential risks to safety. *See* 49 U.S.C. §§ 30166(c), 30166(e).

2

5.      A person who violates the defect notification requirements of the Safety Act, or a regulation thereunder, is currently liable to the United States Government for a civil penalty of not more than $7,000 for each violation, subject to a limit of $35,000,000 for a related series of violations. *See* 49 U.S.C. § 30165(a)(1); 49 C.F.R. § 578.6(a)(1). A person who fails to comply with the records retention and/or reporting obligations of section 30166 is currently liable for penalties of up to $7,000 per day per violation, subject to a limit of $35,000,000 for a related series of violations. 49 U.S.C. § 30165(a)(3); 49 C.F.R. § 578.6(a)(3). A separate violation occurs for each item of motor vehicle equipment and for each failure or refusal to allow or perform a required act. 49 U.S.C. § 30165(a)(1); 49 C.F.R. § 578.6(a)(1).

6.      Takata is a manufacturer of motor vehicle equipment within the meaning of the Safety Act, *see* 49 U.S.C. §§ 30102(a)(5), 30102(a)(7), and a person within the meaning of 49 U.S.C. § 30165.

**II.      BACKGROUND**

7.      On June 11, 2014, NHTSA opened a formal defect investigation (Preliminary Evaluation, PE14-016) into certain Takata air bag inflators that may become over-pressurized and rupture during air bag deployment, resulting in injury to the driver and/or passenger.

8.      During the course of PE14-016, NHTSA issued two Special Orders to Takata, one on October 30, 2014 and one on November 18, 2014, and one General Order to Takata and the affected motor vehicles manufacturers on November 18, 2014, all of which requested documents and information related to the investigation.

9.      On February 24, 2015, NHTSA upgraded and expanded its investigation to include various model year 2001-2011 motor vehicles, which contain air bag inflators manufactured by Takata (Engineering Analysis, EA15-001).

3

10.     On May 18, 2015, Takata filed four Defect Information Reports with NHTSA in accordance with 49 C.F.R. § 573.6 (the "Takata DIRs"). In those Takata DIRs, Takata identified a defect related to motor vehicle safety that may arise in some of the frontal air bag inflator types that it has manufactured. The Takata DIRs have been designated by NHTSA as Recall Nos. 15E-040, 15E-041, 15E-042, and 15E-043.

11.     On May 18, 2015, in connection with the filing of the Takata DIRs, Takata agreed to and NHTSA issued a Consent Order in EA15-001 (the "First Takata Consent Order"). Under the terms of the First Takata Consent Order, Takata was required to continue its cooperation in NHTSA investigation EA15-001; continue its cooperation in all regulatory actions and proceedings that may become part of NHTSA's ongoing investigation and oversight of Takata air bag inflators; submit a plan to NHTSA outlining the steps Takata would take to maximize recall completion rates (the "'Get the Word Out' Digital Outreach Plan"); and submit a plan to provide NHTSA with test data and other information regarding the service life and safety of the remedy inflators (the "Proposed Plan to Test the Service Life and Safety of Certain Inflators"). *See* First Takata Consent Order at ¶¶ 7, 10. To date, Takata has substantially complied with the First Takata Consent Order.

12.     On June 5, 2015, NHTSA issued a Notice of Coordinated Remedy Program Proceeding for the Replacement of Certain Takata Air Bag Inflators, and opened Docket No. NHTSA-2015-0055, to determine what action, if any, the agency should undertake to prioritize, organize, and phase the recall and remedy programs related to the Takata DIRs. *See* 80 Fed. Reg. 32197 (June 5, 2015).

13.     Since commencing the Coordinated Remedy Program Proceeding, NHTSA has issued two additional Special Orders to Takata - one on June 19, 2015 and one on August 13,

2015. The Special Orders sought documents and information relevant to NHTSA's investigation and the Coordinated Remedy Program Proceeding. To date, Takata has substantially complied with these Special Orders.

## III.   FINDINGS

14.     During the course of NHTSA's investigation, including its review of Takata's responses to the Special Orders issued by NHTSA, its review of documents produced by Takata, and its review of information proactively disclosed by Takata, the agency has discovered facts and circumstances indicating that Takata may have violated the Safety Act and the regulations thereunder in at least some respects; including possible violations of 49 U.S.C. § 30118(c)(1), 49 U.S.C. § 30119(c)(2), 49 U.S.C. § 30166, 49 C.F.R. § 573.3(e)-(f), and 49 C.F.R. § 573.6(b). It is the mutual desire of NHTSA and Takata to resolve these alleged violations, without the need for further action, to avoid the legal expenses and other costs of a protracted dispute and potential litigation, as well as to establish remedial measures with the purpose of mitigating risk and deterring future violations.

15.     More specifically, during the course of NHTSA's investigation, the agency has discovered facts and circumstances indicating that:

a.      Takata failed to provide notice to NHTSA of the safety-related defect that may arise in some of the inflators that are the subjects of Recall Nos. 13E-017, 14E-073, 15E-040, 15E-041, 15E-042, and 15E-043 within five working days of when Takata determined, or in good faith should have determined, the existence of that defect.

b.      In several instances, Takata produced testing reports that contained selective, incomplete, or inaccurate data.

5

   c.  Takata failed to clarify inaccurate information provided to NHTSA, including, but not limited to, during a presentation made to the agency in January 2012.

   d.  Takata failed to comply fully with the instructions contained in the Special Orders issued by NHTSA on October 30, 2014 and November 18, 2014, as set forth more fully in the agency's February 20, 2015 letter to Takata.

## IV. LEGAL AUTHORITY

  16.  NHTSA issues this Consent Order pursuant to its authority under the Safety Act, 49 U.S.C. § 30101, *et seq.*, as delegated by the Secretary of Transportation, 49 C.F.R. §§ 1.95, 501.2(a)(1), including, among other things, its authority to inspect and investigate, 49 U.S.C. § 30166(b)(1); compromise the amount of civil penalties, 49 U.S.C. § 30165(b); ensure that defective vehicles and equipment are recalled, 49 U.S.C. §§ 30118-30119; ensure the adequacy of recalls, 49 U.S.C. § 30120(c)(1); accelerate remedy programs, 49 U.S.C. § 30120(c)(3); and require any person to file reports or answers to specific questions, 49 U.S.C. § 30166(g). In consideration of Takata's entry into this Consent Order and its commitments outlined below, it is AGREED by Takata and ORDERED by NHTSA as follows:

## V. TERMS AND CONDITIONS OF CONSENT ORDER

### Safety Act Admissions

  17.  Takata admits that it did not satisfy the notice provisions of the Safety Act when it failed to provide notice to NHTSA of certain information potentially relevant to one or more of the safety-related defects that may arise in some of the inflators that are the subjects of Recall Nos. 13E-017, 14E-073, 15E-040, 15E-041, 15E-042, and 15E-043 within the five-day period provided by the Safety Act and regulations prescribed thereunder in 49 U.S.C. § 30118(c)(1),

49 U.S.C. § 30119(c)(2), 49 C.F.R. § 573.3(e)-(f), and 49 C.F.R. § 573.6(b), which at the time Takata did not believe was required.

18.    Takata admits that it failed to provide, within the time limits requested by NHTSA, an explanation of certain documents produced to NHTSA pursuant to the Special Orders issued by NHTSA on October 30, 2014 and November 18, 2014.

**Civil Penalty**

19.    Subject to the terms in the remainder of this Paragraph 19, Takata shall pay a civil penalty in the sum of two hundred million dollars ($200,000,000) in connection with the matters addressed in this Consent Order, as follows:

    a.    The sum of seventy million dollars ($70,000,000) shall be paid as the Civil Penalty Amount in accordance with the instructions set forth in Paragraph 20.

    b.    The sum of sixty million dollars ($60,000,000), in the form of Stipulated Civil Penalties, shall be deferred and held in abeyance pending satisfactory completion of Paragraph 26.b.

    c.    The sum of seventy million dollars ($70,000,000), in the form of Liquidated Penalties, shall be deferred and held in abeyance, and shall become due and payable in the increments described in Paragraphs 26.a. and 47 below, in the event NHTSA determines that Takata entered into any new contract for the manufacture and sale of any Takata PSAN inflator after the date of this Consent Order, or committed a violation of the Safety Act or the regulations prescribed thereunder, which was not disclosed to NHTSA as of the date of this Consent Order.

20.    Takata shall pay the Civil Penalty Amount of seventy million dollars ($70,000,000) in six lump-sum payments by electronic funds transfer to the U.S. Treasury, in

7

accordance with the instructions provided by NHTSA. The payments shall be made on the following schedule:

| | Date | Amount |
|---|---|---|
| First Payment | February 1, 2016 | $10,000,000 |
| Second Payment | October 31, 2016 | $10,000,000 |
| Third Payment | October 31, 2017 | $10,000,000 |
| Fourth Payment | October 31, 2018 | $10,000,000 |
| Fifth Payment | October 31, 2019 | $15,000,000 |
| Sixth Payment | October 31, 2020 | $15,000,000 |

21.     Takata admits that it has an obligation to the United States in the amount of two hundred million dollars ($200,000,000), as provided for in Paragraph 19 above, arising from activities under the jurisdiction of the U.S. Department of Transportation and subject to the Federal Claims Collection Act of 1966, as amended and codified at 31 U.S.C. § 3701, *et seq.* (hereinafter the "Claims Collection Act").

22.     If Takata fails to make the payment of the Civil Penalty Amount set forth in Paragraph 20 above, or any payment of Stipulated Civil Penalties or Liquidated Penalties, as may be imposed in accordance with Paragraphs 26.a., 26.b., and 47, on or before their respective due dates, Takata shall be in default of this Consent Order and any unpaid amounts shall become immediately due and owing. In that event, (i) Takata agrees not to contest any collection action undertaken by NHTSA or the United States pursuant to the Claims Collection Act and U.S. Department of Transportation regulations, 49 C.F.R. § 89, either administratively or in any court, and (ii) Takata shall affirmatively waive any and all defenses or rights that would otherwise be available to it in any such collection proceeding. In addition, in such a proceeding, Takata shall pay the United States all reasonable costs of collection and enforcement, including attorneys' fees and expenses.

23.     In determining the appropriate amount of the civil penalty to be imposed, the agency has taken into consideration the purpose and objectives of the Safety Act (including the relevant factors set forth at 49 U.S.C. § 30165(c)), as well as the actions and commitments of Takata, including: Takata's willingness to enter into this Consent Order; Takata's decision to terminate certain employees; Takata's continued commitment to cooperate in the agency's ongoing investigation of air bag inflator ruptures, EA15-001, and its commitment to cooperate in the Coordinated Remedy Program announced by NHTSA on November 3, 2015, as set forth in Paragraph 32 below; Takata's commitment to improving its internal safety culture, as set forth in Paragraph 33 below; and the substantial costs Takata will incur in implementing and completing its "Get the Word Out" Digital Outreach Plan, its Proposed Plan to Test the Service Life and Safety of Certain Inflators, and the other obligations of this Consent Order.

**Phase Out of Certain Takata PSAN Inflators**

24.     Takata states that air bags equipped with inflators containing phase-stabilized ammonium nitrate-based propellants (the "Takata PSAN inflators") have generally performed as intended and in the vast majority of cases deploy safely and are effective in saving lives and preventing serious injuries in motor vehicle accidents. Takata further states that it continues to have confidence in the safety of the Takata PSAN inflators it is manufacturing for use in air bags. NHTSA does not share this same confidence in the long-term performance of such inflators, particularly those that do not contain a desiccant;[1] including, but not limited to, the following inflator types: SDI, PSDI, PSDI-4, PSDI-4K, SPI, PSPI, and PSPI-L (the "non-desiccated Takata PSAN inflators"). In order to reach this resolution with NHTSA, and

---

[1]  A desiccant is hygroscopic substance that has a high affinity for moisture and is used as a drying agent.

considering the commercial needs of its customers, Takata has agreed to phase out of the manufacture and sale of certain Takata PSAN inflators, as described below.

25.     To mitigate and control the risk of serious injury or death due to an air bag inflator rupture, and in light of the significant population of vehicles containing Takata inflators, as well as Takata's current understanding of the defect that may arise in some inflators, as set forth in the Takata DIRs (*i.e.*, that "the inflator ruptures appear to have a multi-factor root cause that includes the slow-acting effects of a persistent and long term exposure to climates with high temperatures and high absolute humidity"), the agency believes there is a principled basis to allow Takata, on the schedule set forth below, to phase out of its manufacture and sale of certain Takata PSAN inflators and to continue testing the safety and service life of the Takata PSAN inflators, as set forth in Paragraphs 26-28 below. Based upon the agency's analysis and judgment, this approach best meets the objectives of the Safety Act, while taking into account the size of the affected vehicle population, the apparent nature of the defect mechanism, and other factors as they are best known and understood as of the date of this Consent Order. That being said, NHTSA states that Takata has studied this complex problem for at least the last eight years and, to date, does not have a definitive root cause. The agency does not believe that the American public will be well served if the root cause investigation continues indefinitely. The agency further believes there is a principled basis to require Takata to either demonstrate the safety of the Takata PSAN inflators, or file Defect Information Reports, as set forth in Paragraphs 29-30 below.

NHTSA reserves the right to alter the schedules set forth in Paragraphs 26 and 30 through a final order if NHTSA determines that such alteration is required by the Safety Act based on the occurrence of future field ruptures, testing (whether conducted by Takata, NHTSA, or any other

10

third party), or other circumstances to mitigate an unreasonable risk to safety within the meaning of the Safety Act. Any such order altering the schedules set forth in Paragraphs 26 and 30 will focus on particular types of inflators, on particular periods of manufacture, and on specific vehicles (including, where applicable, vehicle models, model years, and locations of vehicle registration). NHTSA will provide Takata reasonable advance notice of such a proposed order and an opportunity to consult with affected vehicle manufacturers. Upon a schedule to be determined by the Administrator, Takata will have an opportunity to present evidence and seek administrative reconsideration by NHTSA. Takata's objection to, or failure to comply with, any final order issued by NHTSA may be the subject of a civil action regarding Takata's obligations under any such order, including an action to compel specific performance.

26. **New and Existing Contracts.** Takata shall phase out of the manufacture and sale of certain Takata PSAN inflators for use in the United States, as set forth in this Paragraph.

a.     With respect to new contracts, Takata shall not, and hereby represents that it has not since October 31, 2015, commit, contract for sale or resale, offer, provision for use, or otherwise agree to place into the stream of commerce of the United States any Takata PSAN inflator, regardless of whether it contains 2004 propellant or 2004L propellant, and regardless of whether or not it contains desiccant. If Takata violates this Paragraph 26.a., then Takata shall pay Liquidated Penalties as follows: for the first such violation, Takata shall make a lump-sum payment of five million dollars ($5,000,000); for the second such violation, Takata shall make a lump-sum payment of ten million dollars ($10,000,000); and for the third such violation, Takata shall make a lump-sum payment of twenty million dollars ($20,000,000). Each payment of such Liquidated Penalties shall be made by electronic funds transfer to the U.S. Treasury within ten

business days of a final determination of the violation by NHTSA (following a reasonable opportunity for Takata to seek review of the determination), in accordance with the instructions provided by NHTSA. Nothing in this paragraph bars Takata from (1) selling or shipping service or replacement parts for the types of inflators covered by supply contracts existing prior to October 31, 2015, or (2) committing, selling, offering, provisioning for use, or otherwise agreeing to supply Takata PSAN inflator types that contain desiccant in lieu of non-desiccated Takata PSAN inflators; provided, however, that the manufacture and sale may be limited in case of: (i) any non-desiccated Takata PSAN inflators by Paragraph 26.b. and (ii) any desiccated Takata PSAN inflators (as defined in Paragraph 26.c. below) by Paragraph 26.c.

b. With respect to contracts entered into before October 31, 2015, under which Takata is currently obligated to manufacture and sell non-desiccated Takata PSAN inflators in the future, Takata shall phase out of the manufacture and sale of such non-desiccated Takata PSAN inflators for use in the United States, including for use as remedy parts in connection with any existing recall campaign, on the following schedule:

[SCHEDULE FOLLOWS ON NEXT PAGE]

12

| Deadline | Description of Phase Out Commitment |
|---|---|
| By Dec. 31, 2015 | Less than 50% of driver inflators Takata supplies for use in the U.S. will be non-desiccated Takata PSAN inflators. |
| By Dec. 31, 2016 | Less than 10% of driver inflators Takata supplies for use in the U.S. will be non-desiccated Takata PSAN inflators, and none of which shall contain the "Batwing" shaped propellant wafer. |
| By Dec. 31, 2017 | Takata will stop supplying non-desiccated Takata PSAN driver inflators for use in the U.S., subject to de minimis exceptions for the necessary supply of service parts, but only as approved by NHTSA in writing. |
| By Dec. 31, 2016 | Less than 50% of passenger and side inflators Takata supplies for use in the U.S. will be non-desiccated Takata PSAN inflators. |
| By Dec. 31, 2017 | Less than 10% of passenger and side inflators Takata supplies for use in the U.S. will be non-desiccated Takata PSAN inflators. |
| By Dec. 31, 2018 | Takata will stop supplying non-desiccated Takata PSAN passenger and side inflators for use in the U.S., subject to de minimis exceptions for the necessary supply of service parts, but only as approved by NHTSA in writing. |

Takata shall submit to NHTSA a declaration executed by a senior officer, under oath and pursuant to 28 U.S.C. § 1746, within fourteen business days after each deadline set forth above, certifying that it has met the deadline. For purposes of meeting each deadline, Takata may rely on reasonable, good faith estimates or on reasonable representations from vehicle manufacturers in identifying or quantifying inflators produced for use in the United States. If Takata fails to comply with any deadline set forth in this Paragraph 26.b., then Takata shall pay Stipulated Civil Penalties in the amount of $10 million per deadline missed. To the extent such stipulated penalties become due and owing, they shall be paid by wire transfer within ten business days of the missed deadline in accordance with the instructions provided by NHTSA. The payment of Stipulated Civil Penalties **does not** relieve Takata of its obligation to perform as required by this Paragraph 26.b., the continued failure of which may be the subject of a civil action compelling Takata's specific performance.

13

c.      With respect to contracts entered into before October 31, 2015, under
which Takata is currently obligated to manufacture and sell Takata PSAN inflator types
that contain desiccant (the "desiccated Takata PSAN inflators"), including, but not
limited to, SDI-X, PSDI-5, PSDI-X, SPI-X, PSPI-X, SDI-X 1.7, PDP, and SDP, Takata
may continue to manufacture and sell such inflators in accordance with those existing
contracts and purchase orders. However, NHTSA reserves the right to order Takata to
phase out of the manufacture and sale of the desiccated Takata PSAN inflators if NHTSA
determines that such a phase out is required by the Safety Act based on the occurrence of
future field ruptures, testing (whether conducted by Takata, NHTSA, or any other third
party), or other circumstances to mitigate an unreasonable risk to safety within the
meaning of the Safety Act. Any such order will focus on particular types of inflators, on
particular periods of manufacture, and on specific vehicles (including, where applicable,
vehicle models, model years, and locations of vehicle registration). NHTSA will provide
Takata reasonable advance notice of such a proposed order and an opportunity to consult
with affected vehicle manufacturers. Upon a schedule to be determined by the
Administrator, Takata will have an opportunity to present evidence and seek
administrative reconsideration by NHTSA. Takata's objection to, or failure to comply
with, any final order issued by NHTSA may be the subject of a civil action regarding
Takata's obligations under any such order, including an action to compel specific
performance.

**Further Testing of Takata PSAN Inflators and Potential Future Recalls**

27.     **Testing of Non-Desiccated Takata PSAN Inflators.** Takata shall continue its
current service life and safety testing of non-desiccated Takata PSAN inflators. Takata shall

provide frequent updates to NHTSA on the status of this effort and test results, and shall respond fully and accurately to any request for information by the agency.

28. **Testing of Desiccated Takata PSAN Inflators.** Takata shall extend its current service life and safety testing to include testing of desiccated Takata PSAN inflators, with the cooperation of the vehicle manufacturers, to determine the service life and safety of such inflators, and to determine whether, and to what extent, these inflator types suffer from a defect condition, regardless of whether it is the same or similar to the conditions at issue in the Takata DIRs. Takata shall provide frequent updates to NHTSA on the status of this effort and test results, and shall respond fully and accurately to any request for information by the agency.

29. **Agency Defect Determinations.** At any time, the Associate Administrator for Enforcement may make a determination that a defect within the meaning of the Safety Act – *i.e.*, a defect that presents an unreasonable risk to safety – exists in any Takata PSAN inflator type, whether non-desiccated or desiccated, based upon: (a) the occurrence of a field rupture(s) of that Takata PSAN inflator type, (b) testing data and analysis relating to the propensity for rupture of that Takata PSAN inflator type, (c) Takata's ultimate determinations concerning the safety and/or service life of any Takata PSAN inflator type, (d) the determination of root cause of inflator ruptures by any credible source, or (e) other appropriate evidence. Within five business days of receiving such a determination by NHTSA, which shall set forth the basis for the defect determination, Takata shall either submit an appropriate Defect Information Report to the agency or provide written notice that it disputes NHTSA's defect determination. Takata may consult with affected vehicle manufacturers and, upon a schedule to be determined by the Administrator, may present evidence supporting its position, after which the Administrator shall make a final decision. If, after consideration of Takata's submission, the Administrator ultimately concludes

15

that a defect related to motor vehicle safety exists, then he or she may issue a final order

directing Takata to submit the appropriate Defect Information Report(s) to the agency within five

business days of the issuance of the order. Any such order will focus on particular types of

inflators, on particular periods of manufacture, and on specific vehicles (including, where

applicable, vehicle models, model years, and locations of vehicle registration). Takata's

objection to, or failure to comply with, any final order issued by NHTSA may be the subject of a

civil action regarding Takata's obligations under any such order, including an action to compel

specific performance.

     30.    *De Facto* **Defect Determinations.** If no root cause of field ruptures of the

relevant type of inflator has been determined by Takata or any other credible source, or if Takata

has not otherwise been able to make a showing to NHTSA concerning the safety and/or service

life of any of the Takata PSAN inflators to NHTSA's satisfaction by December 31, 2018 for

non-desiccated Takata PSAN inflators and by December 31, 2019 for desiccated Takata PSAN

inflators, then the Administrator may issue one or more final orders setting forth a schedule on

which Takata shall submit Defect Information Reports to the agency for the relevant Takata

PSAN inflators. Any such order will focus on particular types of inflators, on particular periods

of manufacture, and on specific vehicles (including, where applicable, vehicle models, model

years, and locations of vehicle registration). NHTSA will provide Takata reasonable advance

notice of such a proposed order and an opportunity to consult with affected vehicle

manufacturers. Upon a schedule to be determined by the Administrator, Takata will have an

opportunity to present evidence and seek administrative reconsideration by NHTSA. Takata's

objection to, or failure to comply with, any final order issued by NHTSA may be the subject of a

civil action regarding Takata's obligations under any such order, including an action to compel specific performance.

31.    Nothing in this Consent Order, specifically including Paragraphs 25-30, shall relieve Takata of its obligation to make any defect determination and/or to file any Defect Information Report that is required by 49 C.F.R. §§ 573.3(e)-(f), and 573.6(a).

**Other Performance Obligations**

32.    **Cooperation.**

a.    Takata shall comply with its obligations under the Safety Act, and regulations prescribed thereunder, to take all actions reasonably necessary to comply with this Consent Order and to cooperate with NHTSA in carrying out the requirements of this Consent Order. Takata's reasonable best efforts shall include, but shall not be limited to, (i) providing prompt notice to NHTSA in the event any requirement of this Consent Order cannot be met or timely met; and (ii) ensuring that Takata employees involved in carrying out the requirements of this Consent Order are kept well-informed and are allocated sufficient time during their working hours to enable them thoroughly and effectively to perform the actions necessary to carry out those requirements.

b.    Takata shall continue to cooperate with NHTSA in its ongoing investigation and oversight of Takata air bag inflators, including, but not limited to, NHTSA Investigation EA15-001.

c.    Takata shall continue to cooperate in all regulatory actions and proceedings that are part of NHTSA's ongoing investigation and oversight of defective Takata air bag inflators and accompanying remedial actions, including, but not limited to,

the Coordinated Remedy Program, as announced by NHTSA in the Coordinated Remedy

Order issued on November 3, 2015.

33.    **Internal Safety Culture Improvements.** Takata shall work diligently to correct

any lapses and improve its safety culture, as follows:

a.    *Report of Internal Investigation.* Through counsel, Takata shall provide a

detailed written report to NHTSA regarding the history of the rupturing inflator issues

giving rise to Recall Nos. 15E-040, 15E-041, 15E-042, and 15E-043 no later than June

30, 2016. The written report shall include a summary of the facts, internal discussions

and decision-making, safety lapses that Takata has uncovered, and steps taken by Takata

to mitigate the risk. Takata shall not assert any claim of confidentiality or privilege with

respect to this report, which shall be made publicly available by NHTSA.

b.    *Confirmation of Employee Termination.* Within sixty days of the

execution of this Consent Order, Takata shall submit written notice to NHTSA,

confirming the identities of the individuals whose employment has been terminated as a

result of, or in relation to, Takata's review of the subject matter of this Consent Order.

c.    *Chief Safety Assurance and Accountability Officer.* Within sixty days

following execution of this Consent Order, Takata shall designate a Chief Safety

Assurance and Accountability Officer, who shall have independent authority within

Takata to oversee compliance by Takata and its employees with the process

improvements, written procedures, and training programs established by the Monitor.

The Chief Safety Assurance and Accountability Officer is a permanent position and shall

report directly to the board of directors of Takata. Takata shall provide him or her with

sufficient staff and resources to carry out the duties contemplated by this Paragraph 33.c.

fully, efficiently, and without the need for burdensome approvals or administrative delays.

        d.    *Improvements to Internal Whistleblower Reporting.* Takata shall ensure that its existing whistleblower process permits and encourages its employees to expeditiously report concerns regarding irregularities in customer test data, malfunctions, actual or potential safety-related defects, or actual or potential noncompliance with Federal Motor Vehicle Safety Standards. Takata shall establish and rigorously enforce a non-retaliation policy for employees who report such concerns. No later than ninety days following execution of this Consent Order, Takata shall provide NHTSA with written documentation describing the process and policy for whistleblower reporting, as described in this Paragraph 33.d.

34.    **Meetings with NHTSA.** Takata shall meet with NHTSA within ninety days of the execution of this Consent Order to discuss the steps it has taken pursuant to this Consent Order, and the process improvements, written procedures, and training programs being developed and implemented by the Monitor and Chief Safety Assurance and Accountability Officer. Takata shall work with NHTSA to evaluate which recommendations, process improvements, and training programs are appropriate for implementation and will develop a detailed written plan to implement any recommendations deemed appropriate. Takata shall thereafter meet with NHTSA on a quarterly basis for one year to discuss Takata's implementation of any recommendations NHTSA determines are appropriate. Takata agrees that, absent compelling circumstances, Kevin M. Kennedy, Executive Vice President of Takata (or his successor, if applicable), will attend the meetings, along with any other Takata officials, employees, or representatives whom Takata considers appropriate attendees. NHTSA may

19

extend the period of time for periodic meetings (no more frequently than once per quarter)

pursuant to this Paragraph 34 for up to the term of this Consent Order.

### Independent Monitor

Takata agrees to retain, at its sole cost and expense, an independent monitor (the

"Monitor") whose powers, rights and responsibilities shall be as set forth below.

35.     **Jurisdiction, Powers, and Oversight Authority.** The scope of the Monitor's

authority is: (i) to review and assess Takata's compliance with this Consent Order, including, but

not limited to, Takata's phasing out of the manufacture and sale of PSAN inflators, as described

in Paragraph 26, its testing efforts, as set forth in Paragraphs 27-28, and the internal safety

improvements described in Paragraph 33.a.-d. above; (ii) to monitor Takata's compliance with

the First Takata Consent Order, including its compliance with, and any alterations to, its "Get the

Word Out" Digital Outreach Plan and its Proposed Pan to Test the Service Life and Safety of

Certain Inflators; and (iii) to oversee, monitor, and assess compliance with the Coordinated

Remedy Program, as set forth in the Coordinated Remedy Order issued by NHTSA on

November 3, 2015.

It is expected and agreed that the Monitor will develop and implement process

improvements, written procedures, and training programs and may make additional

recommendations aimed at enhancing Takata's ability to detect, investigate, and resolve potential

safety related concerns. The Monitor will oversee the activities of the Chief Safety Assurance

and Accountability Officer and, in the event of a dispute, the advice and recommendations of the

Monitor will be controlling. The Monitor is not intended to supplant NHTSA's authority over

decisions related to motor vehicle safety. Except as expressly set forth below, the authority

granted to the Monitor shall not include the authority to exercise oversight, or to participate in,

decisions by Takata about product offerings, decisions relating to product development, engineering of equipment, capital allocation, and investment decisions.

The Monitor's jurisdiction, powers, and oversight authority and duties are to be broadly construed, subject to the following limitation: the Monitor's responsibilities shall be limited to Takata's activities in the United States, and to the extent the Monitor seeks information outside the United States, compliance with such requests shall be consistent with the applicable legal principles in that jurisdiction. Takata shall adopt all recommendations submitted by the Monitor unless Takata objects to any recommendation and NHTSA agrees that adoption of such recommendation should not be required.

36. **Access to Information.** The Monitor shall have the authority to take such reasonable steps, in the Monitor's view, as necessary to be fully informed about those operations of Takata within or related to his or her jurisdiction. To that end, the Monitor shall have:

a. Access to, and the right to make copies of, any and all non-privileged books, records, accounts, correspondence, files, and any and all other documents or electronic records, including e-mails, of Takata and its subsidiaries, and of officers, agents, and employees of Takata and its subsidiaries, within or related to his or her jurisdiction that are located in the United States; and

b. The right to interview any officer, employee, agent, or consultant of Takata conducting business in or present in the United States and to participate in any meeting in the United States concerning any matter within or relating to the Monitor's jurisdiction; provided, however, that during any such interview, such officer, employee, agent, or consultant shall have the right to counsel and shall not be required to disclose privileged information.

     c.    To the extent that the Monitor seeks access to information contained within privileged documents or materials, Takata shall use its best efforts to provide the Monitor with the information without compromising the asserted privilege.

37.   **Confidentiality.**

     a.    The Monitor shall maintain the confidentiality of any non-public information entrusted or made available to the Monitor. The Monitor shall share such information only with NHTSA, except that the Monitor may also determine in consultation with NHTSA that such information should be shared with the U.S. Department of Justice and/or other federal agencies.

     b.    The Monitor shall sign a non-disclosure agreement with Takata prohibiting disclosure of information received from Takata to anyone other than NHTSA or anyone designated by NHTSA or hired by the Monitor. Within thirty days after the end of the Monitor's term, the Monitor shall either return anything obtained from Takata, or certify that such information has been destroyed. Anyone hired or retained by the Monitor shall also sign a non-disclosure agreement with similar return or destruction requirements as set forth in this subparagraph.

38.   **Hiring Authority.** The Monitor shall have the authority to employ, subject to ordinary and customary engagement terms, legal counsel, consultants, investigators, experts, and any other personnel reasonably necessary to assist in the proper discharge of the Monitor's duties.

39.   **Implementing Authority.** The Monitor shall have the authority to take any other actions in the United States that are reasonably necessary to effectuate the Monitor's oversight and monitoring responsibilities.

40.    **Selection and Termination.**

a.    *Term.* The Monitor's authority set forth herein shall extend for a period of five years from the commencement of the Monitor's duties, except that (a) in the event NHTSA determines during the period of the Monitorship (or any extensions thereof) that Takata has violated any provision of this Consent Order, an extension of the period of the Monitorship may be imposed in the sole discretion of NHTSA, up to an additional one-year extension, but in no event shall the total term of the Monitorship exceed the term of this Consent Order; and (b) in the event NHTSA, in its sole discretion, determines during the period of the Monitorship that the employment of a Monitor is no longer necessary to carry out the purposes of this Agreement, NHTSA may shorten the period of the Monitorship, in accordance with subparagraph c.

b.    *Selection.* NHTSA shall consult with Takata, including soliciting nominations from Takata, using its best efforts to select and appoint a mutually acceptable Monitor (and any replacement Monitors, if required) as promptly as possible. In the event NHTSA is unable to identify a Monitor who is acceptable to Takata, NHTSA shall have the sole right to select a Monitor (and any replacement Monitors, if required).

c.    *Termination.* NHTSA shall have the right to terminate the retention of the Monitor at any time for cause, which termination shall be effective immediately. Termination for cause shall include termination for: (i) intentional nonperformance, misperformance, or gross negligence in the performance of the duties set forth in Paragraph 35; (ii) failure to report to NHTSA in the timeframe and manner specified in Paragraph 42; (iii) willful dishonesty, fraud or misconduct; (iv) conviction of, or a plea of nolo contendere to, a felony or other crime involving moral turpitude; or (v) the

23

commission of any act materially inconsistent with the object and purpose of this Consent Order and/or the Safety Act.

Upon the mutual agreement of NHTSA and Takata, the Monitor's retention may be terminated without cause upon thirty days prior written notice to the Monitor.

41.     **Notice regarding the Monitor; Monitor's Authority to Act on Information received from Employees; No Penalty for Reporting.** Takata shall establish an independent, toll-free answering service to facilitate communication anonymously or otherwise with the Monitor. Within ten days of the commencement of the Monitor's duties, Takata shall advise its employees of the appointment of the Monitor, the Monitor's powers and duties as set forth in this Agreement, a toll-free telephone number established for contacting the Monitor, and email and mail addresses designated by the Monitor. Such notice shall inform employees that they may communicate with the Monitor anonymously or otherwise, and that no agent, consultant, or employee of Takata shall be penalized in any way for providing information to the Monitor (unless the Monitor determines that the agent, consultant, or employee has intentionally provided false information to the Monitor). In addition, such notice shall direct that, if an employee is aware of any violation of any law or any unethical conduct that has not been reported to an appropriate federal, state or municipal agency, the employee is obligated to report such violation or conduct to the Monitor. The Monitor shall have access to all communications made using this toll-free number. The Monitor has the sole discretion to determine whether the toll-free number is sufficient to permit confidential and/or anonymous communications or whether the establishment of an additional or different toll-free number is required.

42.     **Reports to NHTSA.** The Monitor shall keep records of his or her activities, including copies of all correspondence and telephone logs, as well as records relating to actions

24

taken in response to correspondence or telephone calls. If potentially illegal or unethical conduct is reported to the Monitor, the Monitor may, at his or her option, conduct an investigation, and/or refer the matter to NHTSA and/or the U.S. Department of Justice. The Monitor may report to NHTSA whenever the Monitor deems fit but, in any event, shall file written reports not less often than every four months regarding: the Monitor's activities; whether Takata is complying with the terms of this Consent Order; any changes that are necessary to foster Takata's compliance with the Safety Act and/or any regulation promulgated thereunder; and any developments associated with the Coordinated Remedy Program. Sixty days prior to the scheduled expiration of his or her term, the Monitor shall submit a closing report to NHTSA assessing Takata's record of compliance with the requirements of the Consent Order.

43.     **Cooperation with the Monitor.**

a.      Takata and all of its officers, directors, employees, agents, and consultants shall have an affirmative duty to cooperate with and assist the Monitor in the execution of his or her duties and shall inform the Monitor of any non-privileged information that may relate to the Monitor's duties or lead to information that relates to his or her duties. Failure of any Takata officer, director, employee, or agent to cooperate with the Monitor may, in the sole discretion of the Monitor, serve as a basis for the Monitor to recommend dismissal or other disciplinary action.

b.      On a monthly basis for a period of one year, the Chief Safety Assurance and Accountability Officer shall provide the Monitor with a written list of every safety-related issue concerning any item of equipment manufactured by Takata that is being investigated, reviewed, or monitored by Takata. The Monitor shall include these issues in the reports to NHTSA under Paragraph 42.

25

44.     **Compensation and Expenses.** Although the Monitor shall operate under the supervision of NHTSA, the compensation and expenses of the Monitor, and of the persons hired under his or her authority, shall be paid by Takata. The Monitor, and any persons hired by the Monitor, shall be compensated in accordance with their respective typical hourly rates. Takata shall pay bills for compensation and expenses promptly, and in any event within thirty days. In addition, within one week after the selection of the Monitor, Takata shall make available reasonable office space, telephone service and clerical assistance sufficient for the Monitor to carry out his or her duties.

45.     **Indemnification.** Takata shall provide an appropriate indemnification agreement to the Monitor with respect to any claims arising out of the proper performance of the Monitor's duties.

46.     **No Affiliation.** The Monitor is not, and shall not be treated for any purpose, as an officer, employee, agent, or affiliate of Takata.

47.     **Liquidated Penalties.** Should NHTSA reasonably determine, whether based on notice from the Monitor as provided in Paragraph 42 above, on documents that become public, but were not produced to NHTSA in accordance with any of the agency's Special Orders to Takata, or on NHTSA's own investigation, that Takata had committed a violation of the Safety Act or the regulations prescribed thereunder, which was not disclosed to NHTSA as of the date of this Consent Order, Takata shall pay Liquidated Penalties in accordance with this Paragraph 47; provided, however, that Takata reserves the right to argue that its actions did not constitute a violation of the Safety Act or the regulations prescribed thereunder, or that such violation was disclosed to NHTSA as of the date of this Consent Order. For the first such violation, Takata shall make a lump-sum payment of five million dollars ($5,000,000); for the second such

violation, Takata shall make a lump-sum payment of ten million dollars ($10,000,000); and for

the third such violation, Takata shall make a lump-sum payment of twenty million dollars

($20,000,000). Each payment of such Liquidated Penalties shall be made by electronic funds

transfer to the U.S. Treasury within ten business days of a final determination of the violation by

NHTSA (following a reasonable opportunity for Takata to seek review of the determination), in

accordance with the instructions provided by NHTSA.

## VI.   TERM OF CONSENT ORDER

48.     Unless otherwise specified, the term of this Consent Order and Takata's

performance obligations thereunder is five years from the date of execution; provided, however,

that NHTSA may, at its sole option, extend the term of this Consent Order for one year if

NHTSA reasonably decides that Takata should not be released from this Consent Order for

failure to comply materially with one or more terms of this Consent Order, or for other good

cause.

## VII.   AMENDMENT

49.     This Consent Order cannot be modified, amended or waived except by an

instrument in writing signed by all parties.

## VIII.   MISCELLANEOUS

50.     **Investigation Remains Open.** Takata recognizes that NHTSA will keep the

agency's investigation open in order to address the outstanding scientific and engineering

questions with respect to the determination of root cause. Therefore, NHTSA's Investigation

EA15-001 shall remain open until such time as NHTSA reasonably concludes, in its sole

discretion and determination, that all issues thereunder have been satisfactorily resolved. Any

and all subsequent actions taken by NHTSA involving or related to the investigation into Takata air bag inflators may be included as part of EA15-001.

51. **Conflict.** In the event of a conflict between the terms and conditions of the First Takata Consent Order and this Consent Order, the terms and conditions of this Consent Order control.

52. **Notice.** Takata shall provide written notice of each required submission under this Consent Order by electronic mail to the Director of NHTSA's Office of Defects Investigation (currently Otto Matheke at Otto.Matheke@dot.gov), with copies to NHTSA's Associate Administrator for Enforcement (currently Frank Borris at Frank.Borris@dot.gov) and NHTSA's Assistant Chief Counsel for Litigation and Enforcement (currently Timothy H. Goodman at Tim.Goodman@dot.gov). For any matter requiring notice by NHTSA to Takata under this Consent Order, such notice shall be by electronic mail to D. Michael Rains, Director of Product Safety for Takata, at mike.rains@takata.com, and to Andrew J. Levander of Dechert LLP, outside counsel to Takata, at andrew.levander@dechert.com. The parties shall provide notice if the individuals holding these positions or their e-mail addresses change.

53. **Application of Federal Law.** Nothing in this Consent Order shall be interpreted or construed in a manner inconsistent with, or contravening, any federal law, rule, or regulation at the time of the execution of this Consent Order, or as amended thereafter.

54. **Release.**

a. Upon the expiration of the term of this Consent Order, the Secretary of Transportation, by and through the Administrator of NHTSA, will be deemed to have released Takata, including its current and former directors, officers, employees, agents, parents, subsidiaries, affiliates, successors, and assigns from liability for any additional

28

civil penalties pursuant to 49 U.S.C. § 30165, in connection with any and all violations of Takata's Safety Act obligations, including those expressly identified in this Consent Order, from the inception of the Safety Act through the execution date of this Consent Order.

        b.      This Consent Order does not release Takata from civil or criminal liabilities, if any, that may be asserted by the United States, the Department of Transportation, NHTSA, or any other governmental entity, other than as described in this Consent Order.

55.    **Breach.** In the event of Takata's breach of, or failure to perform, any term of this Consent Order, NHTSA reserves the right to pursue any and all appropriate remedies, including, but not limited to, actions compelling specific performance of the terms of this Consent Order, assessing interest for untimely settlement payments, and/or commencing litigation to enforce this Consent Order in any United States District Court. Takata agrees that, in any such enforcement action, it will not raise any objection as to venue. Takata expressly waives any and all defenses, at law or in equity, and agrees not to plead, argue, or otherwise raise any defenses other than (i) that the payment of the Civil Penalty Amount, or of any other penalty amounts required by this Consent Order, if applicable, was made to NHTSA as set forth herein, (ii) that Takata has substantially complied with the terms of this Consent Order, and (iii) that NHTSA's subsequent orders under Paragraphs 25, 26, 29, 30, and 50, if issued, were arbitrary, capricious, or contrary to law, including the Safety Act.

56.    **Attorneys' Fees.** The parties shall each bear their own respective attorneys' fees, costs, and expenses, except as provided in Paragraph 22 above.

57. **Authority.** The parties who are the signatories to this Consent Order have the legal authority to enter into this Consent Order, and each party has authorized its undersigned to execute this Consent Order on its behalf.

58. **Tax Deduction/Credit.** Takata agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, local, or foreign tax for any fine or civil penalty paid pursuant to this Consent Order.

59. **Corporate Change.** This Consent Order shall be binding upon, and inure to the benefit of, Takata and its current and former directors, officers, employees, agents, subsidiaries, affiliates, successors, and assigns. Takata agrees to waive any and all defenses that may exist or arise in connection with any person or entity succeeding to its interests or obligations herein, including as a result of any changes to the corporate structure or relationships among or between Takata and any of its parents, subsidiaries, or affiliates.

60. **Severability.** Should any condition or other provision contained herein be held invalid, void or illegal by any court of competent jurisdiction, it shall be deemed severable from the remainder of this Consent Order and shall in no way affect, impair or invalidate any other provision of this Consent Order.

61. **Third Parties.** This Consent Order shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Order.

62. **Counterparts.** This Consent Order may be executed in counterparts, each of which shall be considered effective as an original signature.

63. **Effective Date.** This Consent Order shall be effective upon its full execution.

64. **Integration.** This Consent Order is a fully integrated agreement and shall in all respects be interpreted, enforced and governed under the federal law of the United States. This

Consent Order sets forth the entire agreement between the parties with regard to the subject matter hereof. There are no promises, agreements, or conditions, express or implied, other than those set forth in this Consent Order and the attachments thereto.

[SIGNATURES ON NEXT PAGE]

31

APPROVED AND SO ORDERED:

NATIONAL HIGHWAY TRAFFIC SAFETY
  ADMINISTRATION,
U.S. DEPARTMENT OF TRANSPORTATION

Dated: November 3, 2015        By:   **// ORIGINAL SIGNED BY //**

Mark R. Rosekind, Ph.D.
Administrator

Dated: November 3, 2015        By:

Paul A. Hemmersbaugh
Chief Counsel

Dated: November 3, 2015        By:

Timothy H. Goodman
Assistant Chief Counsel
  for Litigation and Enforcement

Dated: November 3, 2015        By:

Elizabeth H. Mykytiuk
Trial Attorney

Dated: November 3, 2015        By:

Kara L. Fischer
Trial Attorney

Dated: November 3, 2015        By:

Arija M. Flowers
Trial Attorney

32

AGREED:

Dated: November 2, 2015

TK HOLDINGS INC.

By: _____

Kevin M. Kennedy
Executive Vice President

Dated: November 2, 2015

By: _____

Andrew J. Levander
Dechert LLP
Counsel for TK Holdings, Inc.
Approved as to Form

33

# EXHIBIT C

**UNITED STATES DEPARTMENT OF TRANSPORTATION**
**NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION**
1200 New Jersey Avenue SE
Washington D.C. 20590

| | |
|---|---|
| **In re:** | ) |
| | ) |
| Docket No. NHTSA-2015-0055 | ) |
| Coordinated Remedy Program Proceeding | ) |
| | ) |
| | ) |

## COORDINATED REMEDY ORDER

This Coordinated Remedy Order ("Order") is issued by the Administrator of the National

Highway Traffic Safety Administration ("NHTSA"), an operating administration of the U.S.

Department of Transportation. Pursuant to NHTSA's authority under the National Traffic and

Motor Vehicle Safety Act of 1966, as amended and recodified (the "Safety Act"), 49 U.S.C. §

30101, *et seq*., and specifically, 49 U.S.C. §§ 30118-30120, 30120(a)(1), 30120(c)(2)-(3),

30166(b), 30166(c), 30166(e), 30166(g)(1), and 49 CFR §§ 573.6, 573.14, this Coordinated

Remedy Order establishes a Coordinated Remedy Program and sets forth the requirements and

obligations of certain motor vehicle manufacturers[1] and TK Holdings, Inc., ("Takata") in

connection with the recall and remedy of certain types of Takata air bag inflators.

---

[1]  Currently, BMW of North America, LLC ("BMW"), FCA US, LLC ("FCA") (formerly Chrysler), Daimler Trucks North America, LLC ("Daimler Trucks"), Daimler Vans USA, LLC ("Daimler Vans"), Ford Motor Company ("Ford"), General Motors, LLC ("GM"), American Honda Motor Company ("Honda"), Mazda North American Operations ("Mazda"), Mitsubishi Motors North America, Inc. ("Mitsubishi"), Nissan North America, Inc. ("Nissan"), Subaru of America, Inc. ("Subaru"), and Toyota Motor Engineering and Manufacturing ("Toyota"). In accordance with Paragraphs 45, 46, and 48 below, this list may expand at some future date to include other motor vehicle manufacturers who have sold or otherwise made available in the United States motor vehicles equipped with Takata air bag inflators containing phase-stabilized ammonium nitrate.

## I.    NATURE OF THE MATTER AND FINDINGS.

1.      On June 5, 2015, NHTSA opened the Coordinated Remedy Program Proceeding and public Docket Number NHTSA-2015-0055 to address the recalls of certain Takata air bag inflators, which together constitute the largest Safety Act recall in NHTSA's history and one of the largest consumer product recalls in United States history. *See Notice of Coordinated Remedy Program Proceeding for the Replacement of Certain Takata Air Bag Inflators*, 80 FED. REG. 32,197 (June 5, 2015).  As of the date of this Order, the number of recalled air bag inflators (currently, approximately 23 million), impacted vehicles (currently, approximately 19 million), and affected vehicle manufacturers (currently, twelve), in combination with the potential for expansion of existing recalls and issuance of new recalls, and the remedy part supply challenges related to the existing recalls, presents an unprecedented level of complexity to the routine recall and remedy process.  Given the potential severity of the harm to vehicle occupants when an inflator rupture occurs and the wide-spread exposure to the risk across a large vehicle population, the risk of harm presented by the defective Takata air bag inflators transcends the scope of the processes ordinarily followed in a recall under the Safety Act. Accordingly, for the reasons that follow, and upon consideration of the entire record in this proceeding, NHTSA now issues this Order.

### **Factual Background**

2.      An air bag inflator ("inflator") is a component inside an air bag module that contains explosive materials[2] which, when ignited, rapidly release gases to inflate air bags that protect vehicle occupants in vehicle crashes.  Because inflators must fit into small and unique

---

[2]      More precisely, air bag inflators contain pyrotechnic propellants, stored high pressure gases, or a combination of the two.  To aid the reader's understanding, by using more familiar terminology, this is described herein as an "explosive."

2

spaces including vehicle steering wheels and front instrument panels (i.e., dashboards), and because they must also satisfy specific performance requirements, inflators must meet exacting size and configuration requirements for each air bag module they are paired with and each vehicle in which they are installed. When functioning properly, air bag inflators are life-saving devices.

3. The first recall involving a rupturing Takata driver side frontal air bag inflator was initiated by Honda on November 11, 2008. At that time, the defect was thought to be the result of a specific manufacturing issue involving a propellant press at Takata's Moses Lake, Washington plant. Due to various purported discrepancies in Takata's record keeping for the affected parts, and changing theories as to the root cause of the defect, Honda expanded the scope of the recall several times between 2009 and 2011.

4. The first recall involving a rupturing Takata passenger side frontal air bag inflator was initiated by Takata on April 11, 2013, and involved BMW, Honda, Mazda, Nissan, and Toyota. At that time, the defect was thought by Takata to be the result of two specific manufacturing issues: (1) the possibility that the auto-reject function on a propellant press had been manually disabled, and (2) the possibility that certain propellant lots were exposed to uncontrolled moisture conditions at Takata's Monclova, Mexico plant. In 2013 and 2014, GM recalled vehicles to address separate manufacturing problems specific to a limited number of inflators Takata supplied only to GM.

5. Between August 2013 and April 2014, NHTSA received three Vehicle Owner Questionnaires (VOQs) that alleged air bag inflator ruptures in vehicles outside the scope of the prior driver side and passenger side frontal air bag inflator recalls. In late May 2014, Takata confirmed the three ruptures with NHTSA's Office of Defects Investigation (ODI), and notified

3

ODI of an additional three ruptures (for a total of six rupture incidents between August 2013 and May 2014). All of these ruptures occurred in vehicles experiencing long-term exposure to hot and humid climate conditions in Florida and Puerto Rico.

6.      On June 10, 2014, at NHTSA's urging, Takata and the affected vehicle manufacturers agreed to initiate various field actions in Florida, Hawaii, Puerto Rico, and the U.S. Virgin Islands. The data supporting these field actions indicated that certain Takata frontal air bag inflators in regions prone to consistent long-term[3] exposure to high absolute humidity ("HAH") and high temperatures posed a safety risk. The field actions were designed to mitigate the demonstrated risks in the HAH region, to make inflators available for future testing, and to produce data to guide future actions.

7.      On June 11, 2014, NHTSA opened a preliminary evaluation (PE14-016) to investigate the six identified rupture incidents involving driver side and passenger side frontal air bag inflators manufactured by Takata.

8.      During the period of October through December 2014, at NHTSA's direction, field actions were converted to recalls and the recalls were expanded, though some recalls remained limited to certain regions with higher absolute humidity. Also during this period, NHTSA urged Takata and the affected vehicle manufacturers to, among other things, speed up the remedy programs by increasing the supply of remedy air bag inflators. NHTSA emphasized the need to promptly and effectively remedy the serious safety risk posed to consumers by the defective Takata air bag inflators. Further, as part of its ongoing investigation and oversight, NHTSA issued two Special Orders to Takata on October 30, and November 18, 2014, a Special Order to Honda on November 5, 2014, and General Orders to BMW, FCA, Ford, GM, Honda,

---

[3]      Consistent long-term exposure means multiple years of mostly continuous exposure throughout the year. It is not seasonal exposure.

4

Mazda, Mitsubishi, Nissan, Subaru, Toyota, and Takata on November 18, 2014. All these Special and General Orders were designed and issued by NHTSA to obtain additional data required to assess and mitigate the risk of harm to the motoring public.

9.    On November 18, 2014, NHTSA demanded that the five vehicle manufacturers with affected driver side frontal air bag inflators expand their regional field actions and conduct nationwide actions. This decision was based on, among other things, NHTSA's evaluation of a driver side frontal air bag failure in a vehicle outside the existing regional recall area. In response, beginning in December 2014, BMW, FCA, Ford, Honda and Mazda initiated national service campaigns or safety improvement campaigns on vehicles with driver side frontal air bag inflators.

10.    On November 26, 2014, NHTSA demanded that Takata submit Defect Information Reports ("DIRs") of driver side frontal air bag inflators. While Takata declined to do so in a December 2, 2014 response, NHTSA continued to insist that Takata accept responsibility for the rupturing air bag inflators and file DIRs.

11.    On February 24, 2015, NHTSA upgraded PE14-016 to an engineering analysis (EA15-001).

12.    On May 18, 2015, after NHTSA's consistent demands, and pursuant to its legal obligations under the Safety Act, 49 U.S.C. § 30118(c)(1) and 49 C.F.R. § 573.6(c), Takata filed four DIRs with NHTSA (15E-040, 15E-041, 15E-042, 15E-043) ("Takata DIRs"). In the Takata DIRs, Takata admitted that certain types of air bag inflators manufactured by Takata with a phase-stabilized ammonium nitrate-based propellant (specifically, the PSDI, PSDI-4, PSDI-4K, SPI, PSPI and PSPI-L) contain defects constituting an unreasonable risk to safety.

5

13.     Between May 13, 2015 and June 24, 2015, BMW, FCA, Daimler Trucks,[4] Daimler Vans, Ford, GM, Honda, Mazda, Mitsubishi, Nissan, Subaru, and Toyota (the "Initial Vehicle Manufacturers") each filed DIRs with NHTSA for vehicles containing the air bag inflators covered by the Takata DIRs (the "Inflator Recalls").

14.     As part of the Coordinated Remedy Program Proceeding, launched on June 5, 2015, NHTSA sought information from each of the Initial Vehicle Manufacturers, Takata, and other major inflator suppliers[5] (the "Suppliers"). As an initial matter, this included gathering data from the Initial Vehicle Manufacturers, Takata, and the other Suppliers through correspondence, and a Special Order to Takata, sent on June 18 and 19, 2015.[6] Thereafter, each of these companies provided answers responsive to NHTSA's correspondence, which were available in the public docket.

15.     Among other things, NHTSA engaged in numerous teleconferences and in-person meetings with the Suppliers to enhance NHTSA's understanding of, among other things, each Supplier's current production capacities, capabilities or plans for increasing production, existing contractual obligations, and product reliability. NHTSA also engaged in teleconferences and in-person meetings with the Initial Vehicle Manufacturers to enhance NHTSA's understanding of, among other things, each Vehicle Manufacturer's anticipated timelines for receipt of replacement air bag units, anticipated timelines for remedy program

---

[4]     Daimler Trucks' remedy program of approximately 2,500 vehicles is being conducted in cooperation with FCA.

[5]     ARC Automotive, Inc. ("ARC"), Autoliv Americas ("Autoliv"), Key Safety Systems ("Key Safety"), Toyoda Gosei North America Corporation ("Toyoda"), Daicel Safety Systems America, LLC ("Daicel"), and TRW Automotive ("TRW") which has subsequently become ZF TRW ("ZF TRW").

[6]     The correspondence sent to Takata and each of the Suppliers and Initial Vehicle Manufacturers, and their responses, are available for inspection in public Docket Number NHTSA-2015-0055. Given NHTSA's ongoing investigation into the defective Takata air bag inflators under EA15-001, the correspondence sent to Takata was in the form of a Special Order, with a cover letter. As with the other industry responses to the correspondence of June 18-19, Takata's response to the Special Order was made publicly available as a comment to the Docket.

6

launch and completion, number of impacted vehicles, number of replacement air bag units

needed, and plans and efforts for promptly conducting recall remedies and effectively reaching

consumers.

16.     On September 22, 2015, NHTSA gathered supplemental data from additional

vehicle manufacturers that NHTSA had learned were supplied with Takata air bag inflators

containing phase-stabilized ammonium nitrate ("PSAN")[7] not covered by the Takata DIRs

(collectively, the "Potential Expansion Vehicle Manufacturers"). Thereafter, each of these

companies provided public comments to the docket responsive to the questions and issues raised

in NHTSA's correspondence.

17.     On September 23 and 24, 2015, NHTSA convened problem-solving meetings

with the Initial Vehicle Manufacturers to examine aggregate data and engage in a collaborative

risk analysis to aid NHTSA in developing a principled, rational, risk-mitigation based approach

for the prioritization and phasing of recall plans. Factors considered included those currently

associated with a higher risk of inflator rupture, specifically: age of the inflator (with older

inflators presenting a greater risk); geographic location of vehicles with the recalled inflators

(with HAH areas presenting a greater risk); position of the inflator in the vehicle (with the driver

side frontal air bag inflator presenting a greater risk of serious injury or death when a rupture

occurs); and the presence of recalled inflators in both the driver and passenger side airbag

modules. During the meetings, the Initial Vehicle Manufacturers provided input on factors

supporting a technically supported risk-assessment methodology for the Inflator Recalls.

Following the meeting, each Initial Vehicle Manufacturer submitted a vehicle prioritization list

---

[7]     Correspondence was sent to Jaguar Land Rover North America, LLC ("Jaguar"); Mercedes-Benz US, LLC ("Mercedes-Benz"); Spartan Motors, Inc. ("Spartan"); Suzuki Motor of America, Inc. ("Suzuki"); Tesla Motors, Inc. ("Tesla"); Volkswagen Group of America, Inc. ("Volkswagen"); and Volvo Trucks NA ("Volvo"). The correspondence to each of these vehicle manufacturers, and their responses, are available for public inspection in public Docket Number NHTSA-2015-0055.

that applied these factors, and other factors specific to their products, that prioritized vehicles into three risk categories. NHTSA analyzed these submissions and determined that the Initial Vehicle Manufacturers generally identified reasonable and appropriate priority groups based on the evidence known at this time.

18.     Throughout this process, the public has been able to engage in this dialogue through submissions to the public Docket, NHTSA-2015-0055. In addition to the actions set forth above, NHTSA reviewed and considered all public comments to the docket.

19.     While Takata is a manufacturer of air bag inflators, other Suppliers also manufacture inflators, some of which closely match the performance requirements of the original Takata inflator and thus can be modified and safely installed in Takata air bag modules for use as remedy parts for the Inflator Recalls. This is significant because Takata alone does not have sufficient manufacturing capacity to produce remedy inflators for the Initial Vehicle Manufacturers within an adequate timeframe. According to Takata, it was capable of manufacturing approximately 85,000 replacement kits per week as of October 30, 2014. Takata's production capacity increased to 91,000 replacement kits per week by December 1, 2014, and to 122,000 replacement kits per week by January 26, 2015. By July 2015, Takata reported to NHTSA that, in May 2015, it had produced approximately 730,000 remedy inflators and 1,167,000 remedy kits, which included inflators obtained from other Suppliers. Takata further reported that these numbers were expected to reach 850,000 remedy inflators and 1,900,000 remedy kits produced per month, including inflators obtained from other Suppliers, by October 2015. Takata also reported that, as of June 2015, it had produced a total of approximately 8,900,000 replacement inflators. However, this production is not all directed to the U.S. market; it also serves the global market requiring replacement air bag inflators. Even at

the increased rate of nearly 850,000 remedy inflators per month by October 2015, if working alone it would take Takata at least twenty-seven (27) months to produce enough remedy inflators for the Inflator Recalls, assuming all of that production went solely to the United States market.

20.     Further, some of the Takata driver inflators, sometimes referred to as containing propellant in the shape of a "batwing," have been used as interim replacement parts that will degrade if continuously exposed to long-term to HAH conditions, and are themselves subject to recall. These inflators will not be used as a final remedy of driver side frontal air bags. Further, Takata's passenger side frontal air bag inflators subject to the Inflator Recalls have not previously been recalled for vehicles later than model year 2008.

21.     The Initial Vehicle Manufacturers recognized the need to increase the remedy parts supply in order to have sufficient remedy parts available. To do so, they were required find alternative suppliers to meet their demands for remedy air bag inflator parts. The Initial Vehicle Manufacturers found that necessary alternative supply source in other inflator suppliers, specifically, Autoliv, Daicel, and ZF TRW (collectively, the "Alternative Inflator Suppliers").

22.     According to Takata, in October 2015, the Alternative Inflator Suppliers were scheduled to provide over 1.9 million remedy inflator parts per month for installation in remedy air bag kits. This totaled approximately seventy percent (70%) of the 2.8 million remedy inflator kits produced by Takata that month for global demand. Nonetheless, the sheer volume of remedy parts required across the vehicle manufacturing industry, for both U.S. and foreign markets, has created challenges for the Initial Vehicle Manufacturers in obtaining sufficient remedy parts to remedy all of the recalled inflators within a reasonable time.

9

23.     Despite the efforts of each of the Initial Vehicle Manufacturers to procure remedy parts in a timely fashion, some vehicle manufacturers will not be able to obtain sufficient remedy parts to launch their remedy programs, in part or in full, until late 2015 or early 2016, more than six (6) months after filing their initial DIRs in regard to the Inflator Recalls.

24.     Further, pursuant to a November 3, 2015 Consent Order to Takata ("November 2015 Takata Consent Order"), additional Takata air bag inflators not previously subject to a recall may need to be replaced.  This would cause the Potential Expansion Vehicle Manufacturers to join the existing field of Initial Vehicle Manufacturers (collectively, the "Vehicle Manufacturers") in need of remedy air bag inflator parts.

25.     Each time Takata air bag inflator recalls are issued under the November 2015 Takata Consent Order, or current recalls are expanded, similar challenges will arise for the Vehicle Manufacturers regarding supply chain and the need for risk-assessments based on principled rationales that utilize the most-current available science and data.

26.     Throughout this sequence of events, Takata has conducted inflator testing in an effort to determine the "root cause" of the inflator ruptures and, by testing modules recovered from vehicles that have been remedied, to determine which inflators posed the greatest risk of rupture.  While production issues at Takata manufacturing plants in Monclova, Mexico and Moses Lake, Washington, were identified early on as the purported root cause in some rupture incidents, those theories (even if correct) do not account for the ongoing issues with inflator rupture.  For example, inflators installed in vehicles spending many consecutive years of their service lives in hot and humid climates have also ruptured even though they appear to have been manufactured within Takata's specifications.  While Takata now believes that the ruptures are

10

related to long-term exposure to HAH conditions, their root cause testing has not produced any conclusive answers regarding why the inflators rupture.

27.     Moreover, Takata has been unable to provide a definitive explanation for other inflators rupturing, including the rupture of an SSI-20 side air bag inflator on June 7, 2015, in a Volkswagen vehicle involved in a crash, or the rupture of a PSDI-X inflator during Takata's testing of an air bag module on September 29, 2015 with a resulting recall by Honda. Takata has also been unable to definitively explain the October 2015, rupture of an SSI-20 inflator during Takata quality control testing. It therefore appears to the agency that Takata continues to have ongoing quality control issues with the volatile, explosive compound it has chosen as the propellant for most of its air bag inflators: PSAN.

28.     While the ultimate responsibility for determining root cause rests squarely with Takata, testing has also been conducted by NHTSA and third parties in an effort to establish the root cause of the defect and to verify the results of Takata's testing of inflators returned from the field. NHTSA has conducted testing through Battelle Memorial Institute, 3D Engineering Solutions, and the Transportation Research Center of Ohio, testing organizations located in Ohio, to verify Takata's test results and examine the root cause of the defect. Testing has also been undertaken by the Independent Testing Coalition ("ITC"), which is comprised of BMW, FCA, Ford, GM, Honda, Mazda, Mitsubishi, Nissan, Subaru, and Toyota. Orbital ATK, a testing company located in Utah, has commenced testing on behalf of the ITC, and hopes to conclude root cause analysis in 2016. Multiple individual vehicle manufacturers have also conducted testing in efforts to confirm Takata's results or establish root cause for the defect. While this multitude of independent testing efforts have largely confirmed the observations made and patterns identified from Takata's test results, none of these efforts has identified any

11

specific root cause(s) for the propellant failures and inflator ruptures. While progress is being made, it is unknown when, or if, root cause will ever be definitively determined.

29.     Without a conclusive determination of root cause, the source of the problems with certain Takata inflators remains unknown. What is known, however, is that the propellant in inflators covered by the Inflator Recalls and the recalls within the scope of this Order have, at various rates of frequency, a propensity to ignite and/or burn in an unexpected way that may cause the pressure inside the inflator to increase too quickly, causing the inflator to rupture. That rupture causes the metal canister of the inflator to break away in hot, shrapnel-like fragments, which shoot out of the air bag into the passenger cabin and towards the driver or any occupants who are nearby.

30.     As of October 30, 2015, there have been 99 confirmed incidents in the United States where a ruptured Takata air bag inflator allegedly caused death or injury. Many of these incidents resulted in serious injury to vehicle occupants. In seven of the incidents, the vehicle's driver died as a result of injuries sustained from the rupture of the air bag inflator. In other incidents, vehicle occupants suffered injuries including cuts or lacerations to the face or neck, broken or fractured facial bones, loss of eyesight, and broken teeth. The risk of these tragic consequences is greatest for individuals sitting in the driver seat, where one in ten individuals' whose air bag inflator ruptured has died.

**Findings**

Based upon the agency's analysis and judgment, and upon consideration of the entire record, NHTSA finds that:

31.     (1) there is a risk of serious injury or death if the remedy program of each of the Initial Vehicle Manufacturers is not accelerated; (2) acceleration of each Initial Vehicle Manufacturer's remedy program can be reasonably achieved by expanding the sources of replacement parts; and (3) each Initial Vehicle Manufacturer's remedy program is not likely to be capable of completion within a reasonable time without acceleration.

32.     Each air bag inflator with the capacity to rupture, as the recalled Takata inflators do, presents an unreasonable risk of serious injury or death. Seven individuals have already been killed in the United States alone, with at least 92 more injured. Since the propensity for rupture increases with the age of the inflator, and increases even more when the vehicle has been exposed to consistent long-term HAH conditions, the risk for injurious or lethal rupture increases with each passing day. While each of the Initial Vehicle Manufacturers has made efforts towards the remedy of these defective air bag inflators, acceleration and coordination of the inflator remedy programs is necessary to reduce this risk to public safety. Acceleration and coordination will enable vehicle manufacturers to establish priorities based on principled rationales for risk-assessment, coordinate on safety-focused efforts to successfully complete their respective remedy programs, and allow for the organization and prioritization of remedy parts, if and as needed, with NHTSA's oversight.

33.     Acceleration of the inflator remedy programs can be reasonably achieved by, among other things, expanding the sources of replacement parts. This acceleration can be accomplished in part by a vehicle manufacturer contracting with any of the Alternative Inflator Suppliers for remedy parts as Takata cannot manufacture sufficient remedy parts in a reasonable time for the estimated 23 million inflators in the U.S. market alone that require remedy under the Inflator Recalls.

13

34.    In light of all the circumstances, including the safety risk discussed above, the Initial Vehicle Manufacturers' recall remedy programs are not likely capable of completion within a reasonable amount of time without acceleration of each remedy program.  It is critical to the timely completion of each remedy program that the Initial Vehicle Manufacturers obtain remedy inflators from sources other than Takata.  Takata's inflator production for October 2015 will make up only around thirty percent (30%) of the remedy inflators produced that month.  Further, Takata's ability to supply remedy parts going forward may decrease, such that other Suppliers will need to fill the resulting void.

35.    Pursuant to the conditions for expansion of the recalls in the Takata DIRs for Recall Nos. 15E-042 and 15E-043, Paragraphs 27 – 30 of the November 2015 Takata Consent Order, and as otherwise agreed by Takata, and after consultation throughout this Coordinated Remedy Program Proceeding with Takata and all of the vehicle manufacturers affected by said Recalls, NHTSA further finds that continued testing and analysis of Takata air bag inflators is necessary.  If circumstances warrant the issuance of an Order expanding the production or geographic scope of the Inflator Recalls, the agency will do so in accordance with the November 2015 Takata Consent Order.

36.    The issuance of this Coordinated Remedy Order is an appropriate exercise of NHTSA's authority under the Safety Act, 49 U.S.C. § 30101, *et seq.*, as delegated by the Secretary of Transportation, 49 C.F.R. §§ 1.95, 501.2(a)(1), to inspect and investigate, 49 U.S.C. § 30166(b)(1), to ensure that defective vehicles and equipment are recalled and remedied and that owners are notified of a defect and how to have the defect remedied, 49 U.S.C. §§ 30118-30120, to ensure the adequacy of the remedy, including through acceleration of the remedy program, 49 U.S.C. § 30120(c), to require vehicle manufacturers and equipment

14

manufacturers to keep records and make reports, 49 U.S.C. § 30166(e), and to require any person

to file reports or answers to specific questions, 49 U.S.C. § 30166(g).

37.     This Coordinated Remedy Order, developed after taking into account the input

and concerns of each of the Vehicle Manufacturers, Suppliers, Takata, other interested parties

and the public, will reduce the risk of serious injury or death to the motoring public and enable

the Initial Vehicle Manufacturers and Takata to implement, and complete, the necessary remedy

programs on an accelerated basis.


Accordingly, it is hereby ORDERED by NHTSA as follows:


## II.     TERMS OF THE COORDINATED REMEDY ORDER.

### Priority Groups and Target Recall Program Completion Deadlines for the Coordinated Remedy Program

38.     Each Initial Vehicle Manufacturer has previously submitted to NHTSA a vehicle

prioritization plan based on a risk-assessment that takes into account the primary factors related

to Takata inflator rupture, as currently known and understood, and other factors specific to that

vehicle manufacturer's products.  The primary factors utilized by all of the Initial Vehicle

Manufacturers are: (1) age of the inflator (with older presenting a greater risk of rupture); (2)

geographic location of the inflator (with continuous long-term exposure to high absolute

humidity ["HAH"] areas,[8] as defined by each vehicle manufacturer, presenting a greater risk of

---

[8]     Each vehicle manufacturer has defined an HAH region for its vehicle prioritization and recall remedy
program, resulting in slight variations as to which states and territories are included in the HAH area.  However, **all**
of the prioritizations include in the HAH area vehicles that were originally sold, or ever registered, in Alabama,
Florida, Georgia, Hawaii, Louisiana, Mississippi, Texas, Puerto Rico, American Samoa, Guam, Saipan, and the U.S.
Virgin Islands.  None of the slight variations impact the risk mitigation established through this Order.

rupture); and (3) location of the Takata inflator in the vehicle (with both driver side and passenger side frontal air bag inflators in the same vehicle presenting the greatest risk of rupture,[9] and driver side only presenting an elevated risk of rupture, resulting in serious injury or death). In order to timely and adequately complete its remedy program, each Initial Vehicle Manufacturer shall, pursuant to 49 U.S.C. § 30120(a)(1) and (c), carry out its remedy program in accordance with its prioritization plan as submitted to NHTSA. A complete listing of the vehicles in each priority group ("Priority Group") developed using the above risk factors is attached hereto as Annex A,[10] and is hereby incorporated by reference as if fully set forth herein. The Priority Groups are as follows:

a. **Priority Group 1**

Vehicles in Priority Group 1 are equipped with Takata inflators that pose the highest risk of rupture and thus the highest risk of injury or death to the vehicle occupants. Generally, Priority Group 1 vehicles are currently model year 2008 and earlier, and have spent time[11] in the HAH region, and have either a recalled driver side inflator or *both* recalled driver side and passenger side inflators in the same vehicle.

b. **Priority Group 2**

Vehicles in Priority Group 2 are equipped with Takata inflators that pose an intermediate risk of rupture; that is, a lower risk of rupture and resulting injury or death to vehicle occupants

---

[9]    All recalled Takata inflators have previously been determined to pose an unreasonable risk of death or serious injury in a crash, as established in the filing of each of the many DIRs for the recalled inflators. Comparative statements of risk in the priority groups are provided to explain relative risk among the inflators, all of which pose an unreasonable risk of death or serious injury in a crash.

[10]    Because information about the risk factors may change throughout this Coordinated Remedy Program, these prioritizations are subject to change by a vehicle manufacturer, with NHTSA's oversight of the recall program including vehicle prioritization.

[11]    While continuous long-term exposure to HAH is an identified risk factor, the Priority Groups take this into account by including in the risk-assessment vehicles originally sold or ever registered in the HAH region. Vehicle manufacturers are able to obtain registration information and have used that data in formulating their risk-assessment based Priority Groups.

16

than the inflators and vehicles in Priority Group 1, but a higher likelihood of rupture and injury or death than vehicles in Priority Groups 3 and 4. Generally, Priority Group 2 includes: (1) all remaining vehicles with recalled *driver* side inflators (this includes, vehicles 2009 and newer, and/or vehicles with recalled driver inflators only that have not spent time in the HAH region), and; (2) vehicles with certain recalled passenger inflator types that have a higher rupture frequency and that have also spent time in the HAH region.

### c. **Priority Group 3**

Vehicles in Priority Group 3 are equipped with Takata inflators that pose an unreasonable risk of serious injury or death to vehicle occupants and should be remedied as soon as possible following the remedy of the highest risk vehicles in Priority Groups 1 and 2. The likelihood of these inflators rupturing is lower than Priority Groups 1 and 2. Generally, Priority Group 3 includes the remaining vehicles, specifically, vehicles that are model year 2009 and later and either: (1) are outside the HAH region and contain only a passenger side inflator, or; (2) are in the HAH region and contain a specific passenger side inflator type with a lower rupture rate (the PSPI type) than other passenger side inflator types.

### d. **Priority Group 4**

Some Initial Vehicle Manufacturers are replacing recalled inflators with newly manufactured "like-for-like" inflators while they work towards an alternative, final remedy. Vehicles in Priority Group 4 include those vehicles with driver side frontal air bag inflators that have received, or will receive, an "interim remedy," meaning they have been, or will be, remedied with a Takata inflator that has been recalled, and will require a second remedy once the final remedy is available.[12] Once repaired with the interim remedy, these vehicles are at the

---

[12] NHTSA has entered into Remedy Agreements with BMW and Mazda, which can be found in the investigation file for EA15-001 on www.safercar.gov.

lowest risk of an inflator rupture because the inflator is new and has not yet been subject to long-term continuous exposure to HAH conditions. Unless specifically added at a later date to a higher Priority Group for re-remedy by their vehicle manufacturer, all remaining vehicles requiring a second, final, remedy of the inflator(s) are included in Priority Group 4.

39.     Pursuant to their obligations to remedy a defect within a reasonable time, as set forth in 49 U.S.C. § 30120(a)(1) and § 30120(c)(2), each Initial Vehicle Manufacturer shall acquire a sufficient supply of remedy parts to enable it to provide remedy parts, in a manner consistent with customary business practices, upon demand to dealers within their dealer network by the timelines set forth in this Paragraph. Each Initial Vehicle Manufacturer shall ensure that it has a sufficient supply of remedy parts on the following schedule:

| Priority Group | Sufficient Supply Timelines |
|---|---|
| Priority Group 1 | March 31, 2016 |
| Priority Group 2 | September 30, 2016 |
| Priority Group 3 | December 31, 2016 |

40.     Further pursuant to their obligations to remedy a defect within a reasonable time, as set forth in 49 U.S.C. § 30120(a)(1) and § 30120(c)(2), each Initial Vehicle Manufacturer shall implement and execute its recall remedy program pursuant to the Safety Act with the target deadline to complete the recall remedy program for all vehicles in Priority Groups 1 through 3 of December 31, 2017, and a target deadline to remedy all vehicles in Priority Group 4 of December 31, 2019, as shown below:

| Priority Group | Remedy Completion Target Deadline |
|---|---|
| Priority Group 1 | December 31, 2017 |
| Priority Group 2 | December 31, 2017 |
| Priority Group 3 | December 31, 2017 |
| Priority Group 4 | December 31, 2019 |

18

**Remedy Completion Maximization Efforts**

41.     Pursuant to 49 U.S.C. § 30166(e), within 90 days of this Order, a vehicle manufacturer recalling inflators subject to this Order shall provide to NHTSA and the Monitor (as set forth at Paragraph 44 below), a written recall engagement process or plan for maximizing remedy completion rates for all vehicles covered by the Inflator Recalls. Such a process or plan shall, at a minimum, include but not be limited to the methodology and techniques presented at the Retooling Recalls Workshop[13] held by NHTSA on April 28, 2015, at the U.S. Department of Transportation Headquarters.

42.     Pursuant to 49 U.S.C. § 30166(e), a vehicle manufacturer recalling inflators subject to this Order shall, upon request, provide to NHTSA and the Monitor any and all information demonstrating the reasonableness of the efforts made by that vehicle manufacturer to maximize remedy completion rates.

43.     The facts relating to supply, demand, and root cause may change during this Coordinated Remedy Program.  Pursuant to Paragraph 32 of the November 2015 Takata Consent Order, Takata shall continue to cooperate with NHTSA in all ways to coordinate and accelerate remedy programs, and to adequately remedy the air bag inflators covered by the Inflator Recalls.

**Monitor**

44.     Pursuant to Paragraphs 35 through 46 of the November 2015 Takata Consent Order, Takata has agreed to retain, at its sole cost and expense, an independent monitor (the "Monitor").  The Monitor's authority includes, among other things, certain monitoring, review and assessment of progress of the Coordinated Remedy Program and of compliance with this Order.  The powers, rights and responsibilities of the Monitor are set forth more fully in the

---

[13]     Each of the Initial Vehicle Manufacturers, other than Daimler Vans, registered to attend this Workshop. Presentations from the Workshop are available at: http://www.nhtsa.gov/nhtsa/symposiums/april2015/index.html#.

November 2015 Takata Consent Order, which are hereby incorporated by reference as if fully set forth herein.

    a.  The Monitor shall have the authority to take such reasonable steps, in the Monitor's view, as are necessary to be fully informed about the operations of the Coordinated Remedy Program and this Order.

    b.  It is expected that the Monitor will develop and implement written procedures and may make additional recommendations aimed at enhancing the Coordinated Remedy Program and ensuring that all Coordinated Remedy Program deadlines, including those in this Order, are met.

    c.  The Monitor is not intended to supplant NHTSA's authority over decisions related to the Coordinated Remedy Program, this Order, motor vehicle safety, or otherwise.  If the Monitor identifies a problem or issue, the Monitor shall make appropriate recommendations to NHTSA and provide all supporting information, including information contrary to the Monitor's recommendation, to enable NHTSA to make an informed decision on that recommendation.

    d.  Takata and Vehicle Manufacturers, along with all of their respective officers, directors, employees, agents, and consultants, shall have an affirmative duty to cooperate with and assist the Monitor in connection with the Coordinated Remedy Program and this Order.

**Potential Future Recalls**

45.    The provisions of the November 2015 Takata Consent Order regarding future recalls and possible future recalls, contained at Paragraphs 29 – 30 of that document, are hereby

incorporated by reference into this Order. Accordingly, any future recall(s) of Takata inflators

pursuant to, or contemplated by, Paragraphs 29 – 30 of that Order shall become part of the

Coordinated Remedy Program established herein.

46.     Upon Takata's filing of a DIR pursuant to 49 CFR § 573, the affected vehicle

manufacturer(s) shall timely file a DIR. Upon the filing of such DIRs NHTSA may, pursuant to

49 U.S.C. §§ 30118-30119, 49 U.S.C. § 30120(c), 49 CFR § 573.14, and 49 U.S.C. § 30166(b),

(c), and (e), convene a meeting with the affected vehicle manufacturers to take place within

forty-five (45) days of Takata's DIR filing, at an appropriate location within the United States, as

determined by NHTSA, to address issues related to the Coordinated Remedy Program including,

but not limited to, establishing a risk-assessment framework for the prioritization of vehicles

and/or phasing of remedy programs, as appropriate. Any such prioritizations shall be made

publicly available, and shall be annexed to this Order, in a format similar to the Priority Group

lists in Annex A of this Order.

### Record Keeping & Reports

47.     Pursuant to 49 U.S.C. § 30166(b), (c), (e), and (g), in carrying out any recall

remedy program covered by this Order, each affected vehicle manufacturer and Takata shall

make any report, submit any information, and accommodate any inspection and/or investigation,

as requested by NHTSA or the Monitor.

### Miscellaneous

48.     NHTSA may, after consultation with affected vehicle manufacturers, and/or

Takata, or upon a recommendation of the Monitor, modify or amend provisions of this Order to,

among other things: account for and timely respond to newly obtained facts, scientific data,

changed circumstances, and/or other relevant information that may become available throughout the term of the Coordinated Remedy Program. This includes but is not limited to, changes to the Priority Groups contained in Annex A; allowing for reasonable extensions of time for the timelines contained in Paragraphs 39 and 40; facilitating further recalls as contemplated by Paragraphs 45 and 46; or for any other purpose arising under, or in connection with, the Coordinated Remedy Program and/or this Coordinated Remedy Order.

     49.     This Coordinated Remedy Order shall become effective upon issuance by the NHTSA Administrator. In the event of a breach of, or failure to perform, any term of this Order by Takata or any vehicle manufacturer, NHTSA may pursue any and all appropriate remedies, including, but not limited to, actions compelling specific performance of the terms of this Order, and/or commencing litigation to enforce this Order in any United States District Court.

     50.     This Coordinated Remedy Order shall not be construed to create rights in, or grant any cause of action to, any third party not subject to this Order.

     51.     In carrying out the directives of this Coordinated Remedy Order, vehicle manufacturers and vehicle equipment manufacturers (i.e. suppliers) shall not engage in any conduct prohibited under the antitrust laws, or other applicable law.

IT IS SO ORDERED:

NATIONAL HIGHWAY TRAFFIC SAFETY
ADMINISTRATION,
U.S. DEPARTMENT OF TRANSPORTATION

Dated: November 3, 2015        By:   **// ORIGINAL SIGNED BY //**

                         Mark R. Rosekind, Ph.D.
                         Administrator

## ANNEX A

### Coordinated Remedy Program Priority Groups

In the Priority Groups listed below, the area of high absolute humidity ("HAH") is defined by each vehicle manufacturer individually, but in all instances includes vehicles originally sold or ever registered in Alabama, Florida, Georgia, Hawaii, Louisiana, Mississippi, Texas, Puerto Rico, American Samoa, Guam, Saipan, and the U.S. Virgin Islands. In limited instances, parts for some HAH recalls are currently only available to a limited area within the HAH with the highest risk of rupture. "Non-HAH" means any vehicle that has not been identified by the vehicle manufacturer as having been originally sold or ever registered in the HAH region, as defined by the vehicle manufacturer.

## PRIORITY GROUP 1

**BMW:**

| | | |
|---|---|---|
| 2002-2006 | BMW | 3 Series, M3 (HAH) |

**Daimler Vans USA:**

| | | |
|---|---|---|
| 2007-2008 | Freightliner | Sprinter (HAH) |
| 2007-2008 | Dodge | Sprinter (HAH) |

**Daimler Truck North America-DTNA:**

| | | |
|---|---|---|
| 2008-2009 | Sterling | Bullet (HAH and non-HAH) |

**FCA:**

| | | |
|---|---|---|
| 2006-2008 | Chrysler | 300, 300C, SRT8 (HAH) |
| 2005 | Chrysler | 300, 300C, SRT8 (HAH and non-HAH) |
| 2008 | Dodge | Challenger (HAH) |
| 2006-2008 | Dodge | Charger (HAH) |
| 2005 | Dodge | Dakota (HAH) |
| 2004-2005 | Dodge | Durango (HAH) |
| 2006-2008 | Dodge | Magnum (HAH) |
| 2005 | Dodge | Magnum (HAH and non-HAH) |
| 2004-2005 | Dodge | Ram 1500, 2500, 3500 Pickup (HAH) |

**Ford:**

| | | |
|---|---|---|
| 2005-2006 | Ford | GT (HAH) |
| 2005-2008 | Ford | Mustang (HAH) |
| 2004-2005 | Ford | Ranger (HAH) |

**GM:**

| | | |
|---|---|---|
| 2003-2007 | Pontiac | Vibe (HAH) |
| 2005 | GM-Saab | 9-2X (HAH) |

*Priority Group 1 continued...*

*Priority Group 1 continued from prior page...*

**Honda:**

| | | |
|---|---|---|
| 2003 | Acura | 3.2CL (HAH and non-HAH) |
| 2002-2003 | Acura | 3.2TL (HAH and non-HAH) |
| 2001-2003 | Honda | Accord (HAH and non-HAH) |
| 2001-2003 | Honda | Civic (HAH and non-HAH) |
| 2004-2005 | Honda | Civic (HAH) |
| 2003-2005 | Honda | Civic IMA-Hybrid (HAH) |
| 2003 | Honda | Civic IMA-Hybrid (non-HAH) |
| 2002 | Honda | CR-V (HAH and non-HAH) |
| 2003-2004 | Honda | CR-V (HAH) |
| 2003-2006 | Honda | Element (HAH) |
| 2002 | Honda | Odyssey (HAH) |
| 2003 | Honda | Pilot (HAH and non-HAH) |
| 2004-2005 | Honda | Pilot (HAH) |
| 2006 | Honda | Ridgeline (HAH) |

**Mazda:**

| | | |
|---|---|---|
| 2003-2008 | Mazda | Mazda6 (HAH) |
| 2004-2008 | Mazda | RX8 (HAH) |
| 2006-2007 | Mazda | Speed6 (HAH) |

**Mitsubishi:**

| | | |
|---|---|---|
| 2004-2006 | Mitsubishi | Lancer and Lancer Evolution (HAH) |
| 2004 | Mitsubishi | Lancer Sportback (HAH) |
| 2006-2009 | Mitsubishi | Raider (HAH) |

**Nissan:**

| | | |
|---|---|---|
| 2002-2003 | Infiniti | QX4 (HAH) |
| 2002-2004 | Nissan | Pathfinder (HAH) |
| 2002-2004 | Nissan | Sentra (HAH) |

**Subaru:**

| | | |
|---|---|---|
| 2004-2005 | Subaru | Impreza/WRX/STI (HAH) |
| 2005 | Subaru | Legacy, Outback (HAH) |

**Toyota:**

| | | |
|---|---|---|
| 2007 | Lexus | SC430 (HAH) |
| 2003-2007 | Toyota | Corolla (HAH) |
| 2003-2007 | Toyota | Matrix (HAH) |
| 2005-2007 | Toyota | Sequoia (HAH) |
| 2003-2004 | Toyota | Tundra (HAH) |
| 2005-2006 | Toyota | Tundra (non-HAH) |

## PRIORITY GROUP 2

**BMW:**

| | | |
|---|---|---|
| 2000-2001 | BMW | 3 Series (HAH) |
| 2002-2006 | BMW | 3 Series (non-HAH) |
| 2002-2003 | BMW | 5 Series (HAH and non-HAH) |
| 2003-2004 | BMW | X5 SUV (HAH and non-HAH) |

**Daimler Vans USA:**

| | | |
|---|---|---|
| 2007-2008 | Freightliner | Sprinter (non-HAH) |

**FCA:**

| | | |
|---|---|---|
| 2006-2008 | Chrysler | 300, 300C, SRT8 (non-HAH) |
| 2009-2010 | Chrysler | 300, 300C, SRT8 (HAH and non-HAH) |
| 2005 | Chrysler | 300, 300C, SRT8 (HAH) |
| 2007-2008 | Dodge | Aspen (HAH and non-HAH) |
| 2008 | Dodge | Challenger (non-HAH) |
| 2009-2010 | Dodge | Challenger (HAH) |
| 2006-2008 | Dodge | Charger (non-HAH) |
| 2009-2010 | Dodge | Charger (HAH and non-HAH) |
| 2005-2011 | Dodge | Dakota (HAH and non-HAH) |
| 2004-2008 | Dodge | Durango (HAH and non-HAH) |
| 2005 | Dodge | Magnum (HAH) |
| 2006-2008 | Dodge | Magnum (non-HAH) |
| 2004-2005 | Dodge | Ram 1500 Pickup (HAH) |
| 2003 | Dodge | Ram 1500, 2500, 3500 Pickup (HAH and non-HAH) |
| 2006-2009 | Dodge | Ram 1500, 2500, 3500 Pickup (HAH and non-HAH) |
| 2006 | Dodge | Ram 2500 (HAH) |
| 2007-2008 | Dodge | Ram 3500 Cab Chassis (HAH and non-HAH) |
| 2008-2010 | Dodge | Ram 4500, 5500 Cab Chassis (HAH and non-HAH) |
| 2007-2008 | Dodge | Sprinter (non-HAH) |

**Ford:**

| | | |
|---|---|---|
| 2005-2006 | Ford | GT (HAH) |
| 2005-2008 | Ford | Mustang (non-HAH) |
| 2009-2014 | Ford | Mustang (HAH) |
| 2006 | Ford | Ranger (HAH) |

**GM:**

| | | |
|---|---|---|
| 2003-2007 | Pontiac | Vibe (non-HAH) |
| 2007-2008 | Chev/GMC | Silverado/Sierra (HAH) |

*Priority Group 2 continued...*

3

*Priority Group 2 continued from prior page…*

**Honda:**

| | | |
|---|---|---|
| 2003-2006 | Acura | MDX (HAH and non-HAH) |
| 2004-2007 | Honda | Accord (HAH and non-HAH) |
| 2004-2005 | Honda | Civic (non-HAH) |
| 2004-2005 | Honda | Civic Hybrid (non-HAH) |
| 2005-2006 | Honda | CR-V (HAH) |
| 2003-2006 | Honda | CR-V (non-HAH) |
| 2007-2011 | Honda | Element (HAH) |
| 2003-2007 | Honda | Element (non-HAH) |
| 2003-2004 | Honda | Odyssey (HAH) |
| 2002-2004 | Honda | Odyssey (non-HAH) |
| 2006-2008 | Honda | Pilot (HAH) |
| 2004-2007 | Honda | Pilot (non-HAH) |
| 2006 | Honda | Ridgeline (non-HAH) |

**Mazda:**

| | | |
|---|---|---|
| 2003-2008 | Mazda | Mazda6 (non-HAH) |
| 2004-2006 | Mazda | B-Series (HAH) |
| 2004-2005 | Mazda | MPV (HAH) |
| 2004-2008 | Mazda | RX8 (non-HAH) |
| 2006-2007 | Mazda | Speed6 (HAH) |

**Mitsubishi:**

| | | |
|---|---|---|
| 2004-2006 | Mitsubishi | Lancer, Lancer Evolution (non-HAH) |
| 2004 | Mitsubishi | Lancer Sportback (non-HAH) |
| 2006-2009 | Mitsubishi | Raider (non-HAH) |

**Nissan:**

| | | |
|---|---|---|
| 2003 | Infiniti | FX (HAH) |
| 2001 | Infiniti | I30 (HAH) |
| 2002-2003 | Infiniti | I35 (HAH) |
| 2002-2003 | Infiniti | QX4 (non-HAH) |
| 2001-2003 | Nissan | Maxima (HAH) |
| 2002-2004 | Nissan | Pathfinder (HAH and non-HAH) |
| 2004-2006 | Nissan | Sentra (HAH and non-HAH) |

**Subaru:**

| | | |
|---|---|---|
| 2003-2005 | Subaru | Legacy, Outback, Baja (HAH) |

*Priority Group 2 continued…*

*Priority Group 2 continued from prior page...*

**Toyota:**

| | | |
|---|---|---|
| 2007 | Lexus | SC430 (non-HAH) |
| 2003-2007 | Toyota | Corolla (non-HAH) |
| 2003-2007 | Toyota | Matrix (non-HAH) |
| 2004-2005 | Toyota | RAV4 (HAH and non-HAH) |
| 2002-2004 | Toyota | Sequoia (HAH) |
| 2005-2007 | Toyota | Sequoia (non-HAH) |
| 2003-2004 | Toyota | Tundra (HAH) |
| 2005-2006 | Toyota | Tundra (non-HAH) |

## PRIORITY GROUP 3

**BMW:**

| | | |
|---|---|---|
| 2000-2001 | BMW | 3 Series (non-HAH) |

**Daimler Vans USA:**

| | | |
|---|---|---|
| 2007-2008 | Freightliner | Sprinter (non-HAH) |
| 2007-2008 | Dodge | Sprinter (non-HAH) |

**Ford:**

| | | |
|---|---|---|
| 2005-2006 | Ford | GT (non-HAH) |
| 2009-2014 | Ford | Mustang (non-HAH) |
| 2004-2006 | Ford | Ranger (non-HAH) |

**GM:**

| | | |
|---|---|---|
| 2007-2008 | Chev/GMC | Silverado/Sierra (non-HAH) |
| 2005 | GM-Saab | 9-2X (non-HAH) |

**Honda:**

| | | |
|---|---|---|
| 2005 | Honda | RL (HAH and non-HAH) |
| 2008-2011 | Honda | Element (non-HAH) |
| 2008 | Honda | Pilot (non-HAH) |

**Mazda:**

| | | |
|---|---|---|
| 2004-2006 | Mazda | B-Series (non-HAH) |

**Nissan:**

| | | |
|---|---|---|
| 2003 | Infiniti | FX (non-HAH) |
| 2004-2005 | Infiniti | FX (HAH and non-HAH) |
| 2001 | Infiniti | I30 (non-HAH) |
| 2002-2004 | Infiniti | I35 (HAH and non-HAH) |
| 2006 | Infiniti | M (HAH and non-HAH) |
| 2001-2003 | Nissan | Maxima (non-HAH) |

**Subaru:**

| | | |
|---|---|---|
| 2004-2005 | Subaru | Impreza/WRX/STI (non-HAH) |
| 2003-2004 | Subaru | Legacy, Outback, Baja (non-HAH) |

**Toyota:**

| | | |
|---|---|---|
| 2002-2006 | Lexus | SC430 (HAH and non-HAH) |
| 2002-2004 | Toyota | Sequoia (non-HAH) |
| 2003-2004 | Toyota | Tundra (non-HAH) |

# EXHIBIT D

# CRAVATH, SWAINE & MOORE LLP

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: +1-212-474-1000
FACSIMILE: +1-212-474-3700

JOHN W. WHITE
EVAN R. CHESLER
KRIS F. HEINZELMAN
ROGER D. TURNER
PHILIP A. GELSTON
RICHARD W. CLARY
JAMES D. COOPER
STEPHEN L. GORDON
DANIEL L. MOSLEY
ROBERT H. BARON
KEVIN J. GREHAN
C. ALLEN PARKER
SUSAN WEBSTER
DAVID MERCADO
ROWAN D. WILSON
CHRISTINE A. VARNEY
PETER T. BARBUR
SANDRA C. GOLDSTEIN
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KEITH R. HUMMEL

DAVID J. KAPPOS
DANIEL SLIFKIN
ROBERT I. TOWNSEND, III
WILLIAM J. WHELAN, III
SCOTT A. BARSHAY
PHILIP J. BOECKMAN
ROGER G. BROOKS
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
MARK I. GREENE
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. MCATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
LIZABETHANN R. EISEN
DAVID S. FINKELSTEIN

DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
JOEL F. HEROLD
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
TEENA-ANN V. SANKOORIKAL
ANDREW R. THOMPSON
DAMIEN R. ZOUBEK
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ERIC L. SCHIELE
ALYSSA K. CAPLES
JENNIFER S. CONWAY
MINH VAN NGO
KEVIN J. ORSINI
MATTHEW MORREALE
JOHN D. BURETTA
J. WESLEY EARNHARDT
YONATAN EVEN
BENJAMIN GRUENSTEIN
JOSEPH D. ZAVAGLIA
STEPHEN M. KESSING

LAUREN A. MOSKOWITZ
DAVID J. PERKINS
JOHNNY G. SKUMPIJA
J. LEONARD TETI, II
D. SCOTT BENNETT
TING S. CHEN
CHRISTOPHER K. FARGO
KENNETH C. HALCOM
DAVID M. STUART
JONATHAN L. DAVIS
AARON M. GRUBER
O. KEITH HALLAM, III
OMID H. NASAB
DAMARIS HERNÁNDEZ
JONATHAN J. KATZ

SPECIAL COUNSEL
SAMUEL C. BUTLER
GEORGE J. GILLESPIE, III

OF COUNSEL
MICHAEL L. SCHLER

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: +44-20-7453-1000
FACSIMILE: +44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER
+1-212-474-1260

WRITER'S EMAIL ADDRESS
jburetta@cravath.com

April 1, 2016

<u>Independent Monitor for Takata and the Coordinated Remedy Program</u>

Dear Mr. Turley:

Pursuant to Paragraph 44 of the Coordinated Remedy Order (the "CRO"), I write concerning the status of the Takata recalls.

Based on the completion rates achieved to date, it is clear that the conventional, homogeneous approach to recall outreach—characterized by notice letters and robocalls—will not be enough to accelerate the completion of these recalls. All OEMs must pursue innovative, targeted strategies that recognize the complexity of this recall and the severity of the defect at issue. OEMs should direct robust efforts especially at Priority Group 1, which includes vehicles in higher-risk HAH zones for which completion rates remain too low, and as to which Paragraph 39 of the CRO requires a sufficient supply of remedy parts to have been acquired by each OEM by March 31, 2016.

I am attaching an initial list of strategies that all OEMs should employ to enhance the Coordinated Remedy Program and accelerate completion. These strategies include, among others, programs described in certain individual OEMs' recall plans submitted pursuant to Paragraph 41 of the CRO. This list is not intended to be exhaustive, and my expectation is that you will continue to independently identify, test and share additional approaches of your own in the coming weeks, in part by leveraging your in-house marketing teams. I also request that each OEM continuously analyze the data it is generating in the newly instituted biweekly dashboards to identify areas of particular success and areas of special inadequacy, and rapidly build targeted strategies to improve completion rates on that basis.

The attached list is organized into four general categories: (i) consumer outreach and communication; (ii) dealer relations; (iii) private sector engagement; and (iv) loose parts recovery. I ask that you consider implementing all these approaches as soon as possible (to the extent you are not doing so already), and be prepared on your next call with the Monitor team to discuss the status of your company's efforts with regard to each, your company's measurement of their effectiveness, and other efforts you are pursuing or plan to undertake to improve completion rates and safeguard consumers.

As always, please do not hesitate to contact me with any questions, concerns or suggestions.

Sincerely,

John Buretta /A IR

John Buretta

John Turley
     Principal Engineer
          American Honda Motor
               1919 Torrance Blvd.
                    Torrance, CA 90501

VIA EMAIL

Copies to:

James Oliva
Elmer Hardy
Crickett Breuninger
     American Honda Motor
          1919 Torrance Blvd.
               Torrance, CA 90501

Elizabeth Mykytiuk
     Trial Attorney
          United States Department of Transportation
               National Highway Traffic Safety Administration
                    1200 New Jersey Avenue, SE
                         Washington, DC 20590

Encl.

## Initial List of OEM Enhanced Outreach Strategies

1. **Consumer Outreach and Communication.**

   a. *Social media.*

   Use outlets such as Facebook, Twitter and other social media to target registrant models with messages that are motivation-oriented (as opposed to awareness-oriented).

   b. *Leverage customers' networks.*

   Consider messages or incentives for friends and family to share recall information and generate repairs (e.g., a free oil change if a person's social media contact brings a car in for repair).

   c. *Streaming media.*

   Use streaming media and apps to deliver customized, motivation-oriented messages.

   d. *Phone calls and SMS messaging.*

   Establish a consistent protocol whereby dealers collect a broad array of customer contact information—including mobile numbers, landlines and email addresses—to supplement registration data. Make telephone calls to contact vehicle owners directly, and assist in scheduling repair appointments with a dealer during the call. Where mobile numbers are available, utilize SMS messaging.

   e. *Contact consumers who are searching their VINs.*

   For each customer who enters a VIN on safercar.gov or the recall portion of your website and has an open airbag recall, contact the customer directly (ideally by telephone) to emphasize the urgency of the repair, and seek to schedule the repair during the call.

   f. *Ease of website use.*

   Regularly review the recall pages of your website to ensure that customers can readily obtain the latest recall information and search their VIN. Provide opportunities for live chat and direct connection to local dealerships, if possible.

   g. *Outreach strategy tracking and measurability.*

   Implement procedures to measure the success of customer outreach strategies by tracking associated VINs or other identifying information, where appropriate.

h. *Use of multiple relevant languages.*

Use languages other than English for customer communications, when appropriate.

i. *Marketing partnerships.*

Engage in marketing partnerships with organizations that have access to large groups of potential affected owners (e.g., sports leagues, theme parks) to conduct innovative, motivation-oriented announcements and advertising at large events. Consider on-site repair where feasible.

2. **Dealer Relations.**

a. *Dealer Incentives.*

Create or enhance incentives for dealers to schedule and complete recall repairs. For example, consider local, regional or national contests for dealers who achieve the greatest number or proportion of airbag recall repairs.

b. *Policies or compensation for used car operations.*

For dealerships that sell used vehicles, create or enhance incentives for dealers to check their used vehicles for open recalls and arrange for necessary repairs before selling the used vehicle.

c. *Dealer rental policy.*

Make rental vehicles available, particularly as to Priority Group 1 vehicles and other owners concerned for their safety. Where feasible, provide taxi or other car service (e.g., Uber, Lyft), to reduce inconvenience for customers traveling to and from their dealership while their repair is being done.

d. *Priority Service.*

Ensure that owners are not further inconvenienced due to dealership scheduling. Provide "front of the line" service, overnight service, weekend service, or ways of limiting the time vehicle owners need to spend traveling to or waiting at dealerships.

3. **Private Sector Engagement.**

a. *Vendor Communication.*

Develop motivation-oriented communication that can be shared with vendors, suppliers and service providers. Encourage these parties to help spread the word to their employees (and beyond, to those employees' friends and family).

b. *National and local used car companies.*

Seek out national and local used car sellers. Identify ways to verify whether vehicles in inventory have open airbag recalls, and develop solutions for repair prior to sale of the vehicle.

c. *Fleet, Business and Government Owners.*

Identify all fleet, business and government owners and determine how many unrepaired vehicles they have. Perform individual outreach to the relevant points of contact to achieve repairs.

d. *Independent Repair Facilities.*

Distribute materials to independent repair facilities enabling technicians and waiting customers to determine whether their vehicle is under recall, which actions need to be taken and how to quickly schedule a repair.

e. *Additional Targeting of Used Vehicle Sales.*

Share VIN information with services such as CarFax, and online listings such as Autotrader and Car.com, so that open recalls can be identified when prospective purchasers request a report or initiate a transaction.

4. **Salvage Parts Recovery.**

Employ vendors able to retrieve parts from salvage yards. Provide VIN information to integrated vendors who can search inventory, purchase parts and verify retrieval.

# EXHIBIT E

```
From: <elizabeth.mykytiuk@dot.gov>
To:   <doug_bishop@hna.honda.com>,
Date: 04/19/2016 10:32 AM
Subject:    Robo-calls and text messages
```

Mr. Bishop:

As you are aware, on April 1, 2016, John Buretta, the Independent Monitor appointed under NHTSA's November 3, 2015 Coordinated Remedy Order, sent American Honda Motor Co. the attached letter, containing a list of general strategies to increase recall completion for the Takata air bag inflator recalls. Those strategies include the use of phone calls and SMS messaging. These recommended strategies were discussed at length between NHTSA and the Monitor, and the letter was sent with NHTSA's full support and approval.

The Takata air bag inflator recall is the largest automotive safety recall in this country's history. The recall currently involves fourteen vehicle manufacturers, including Honda, and over 24 million U.S. vehicles. To date, ten people have been killed in the U.S. and more than one hundred have been injured, many seriously, when a defective Takata air bag inflator in their vehicle ruptured, propelling metal shrapnel into the passenger compartment. Despite the serious safety risk, recall completion rates have been unacceptably low, even in areas where there is a sufficient supply of remedy parts available to complete recall repairs.

Unremedied defective Takata inflators present a serious threat to public safety. Given the current rate of recall completion, it is clear that traditional means of communicating recalls – i.e., owner notification letters sent via U.S. Mail – are not sufficient to address this crisis. In consultation with NHTSA, the Monitor made the attached recommendations. NHTSA firmly believes that such strong and extraordinary measures are necessary to ensure the health and safety of the American driving public. Therefore, NHTSA's view is that strategies for reaching consumers through the use of robo-calls and text messages, among other means, are in the public interest.

Yours truly,
Beth

```
|-------------------------------+
|cid:image009.png@01D19990.C9CEF920|Elizabeth H. Mykytiuk
|                               |Senior Trial Attorney,
|                               |Litigation and Enforcement
|                               |Department of Transportation
|                               |National Highway Traffic
|                               |Safety Administration
|                               |1200 New Jersey Avenue SE.,
```

```
|                                    |Washington, DC 20590
|                                    |Office: 202-366-9991 • Cell:
|                                    |202-695-9703
|------------------------------------+
|cid:image010.png@01D19990.C9CEF920|
|cid:image011.png@01D19990.C9CEF920|
|cid:image012.png@01D19990.C9CEF920|
|------------------------------------+
```

(See attached file: 2016-04-01 Letter from J. Buretta - Honda.pdf)